**ALASKA TRAVEL SPECIALISTS, INC., Appellant,**

v.

**The FIRST NATIONAL BANK OF ANCHORAGE, Appellee.**

**No. S–6246.**

Supreme Court of Alaska.

July 19, 1996.

---

John F. McGee, Anchorage, for Appellant.

John R. Beard, Anchorage, for Appellee.

Before COMPTON, C.J., and RABINOWITZ, EASTAUGH, JJ., and SHORTELL, J. Pro Tem.*

## OPINION

SHORTELL, Justice Pro Tem.

## I. INTRODUCTION

This case involves a bank's efforts to protect itself and credit card users from questionable marketing practices. A travel agent claims that the bank overstepped its contractual rights and drove the travel agent out of business. The agent sued the bank for breaching the credit card merchant agreement between them, and appeals an order of summary judgment against it. Because the record does not support summary judgment, we reverse.

## II. FACTS AND PROCEEDINGS

The promotion at the heart of this case arose from the marketing practices of Commonwealth Investments, Inc. (Commonwealth), and its two subsidiaries, West Coast Express (WCE) and Rainbow Travel Club (RTC). WCE was to arrange air travel between Anchorage, Seattle and San Francisco. RTC sold coupons for $170, each exchangeable for an air ticket between Anchorage and Seattle, to consumers who paid $20 to become RTC "members." Although Commonwealth apparently honored some RTC coupons by purchasing tickets on scheduled airlines at a loss, no WCE flight ever flew. Commonwealth and its subsidiaries declared bankruptcy in July 1988, leaving as creditors (by one party's calculation) about 1250 RTC "members" who held about 3000 travel coupons. Neither Commonwealth nor its subsidiaries are parties to this suit.[1]

ATS sold RTC memberships and coupons to consumers, many of whom used Visa and MasterCard credit cards. ATS submitted the charge slips to First National Bank of Anchorage (FNBA) pursuant to their merchant agreement. FNBA, concerned over a sudden increase in credit card business from ATS and a warning to watch for fraudulent practices involving "travel clubs," immediately investigated the Commonwealth companies and their owner, N. Ray Kalyan. Unsatisfied with the information it received, FNBA rejected the RTC charge slips submitted by ATS and refused to honor them or future charge slips for RTC purchases.

ATS claims that FNBA also terminated the merchant agreement so that ATS could no longer make any Visa and Mastercard sales. According to ATS, an ATS employee called the central authorization bureau for credit card approvals, and was told that ATS "was no longer an authorized merchant." ATS's president then called the authorization bureau and received a recorded message to the same effect. FNBA's Senior Vice President Alan Lively testified that ATS could have been told that it was an unauthorized merchant "[b]ecause a flag had been placed on the account," which "was done by somebody in my office," and that he "must have been" aware of it. Lively said that ATS could have authorized non-RTC credit card transactions by calling FNBA directly, though Lively admitted, "I don't recall telling" ATS that it could do so.

FNBA denies that it terminated the merchant agreement, claiming that its policy was to reject only charge slips from ATS for the purchase of RTC coupons and memberships. ATS submitted no charge slips for non-RTC purchases after January 1988. ATS went out of business. It claims its demise was a result of sales lost because it could not conduct credit card business.

ATS sued, claiming that FNBA breached the merchant agreement in two ways: refusal to honor the RTC charge slips, and termination of the agreement without the contractually required thirty-day notice. FNBA moved for summary judgment on two grounds: that it did not breach the contract

---

* Sitting by assignment made pursuant to article IV, section 16 of the Alaska Constitution.

1. As part of a settlement between Alaska Travel Specialists, Inc. (ATS), a travel agent, and Commonwealth, Commonwealth has partial interest in the outcome of this suit and partial responsibility for ATS's legal fees.

and that ATS suffered no legally demonstrable loss. The superior court granted FNBA's motion without specifying its reasons for doing so. ATS appeals.

## III. DISCUSSION

### A. Standard of Review and Burden of Proof.

■ This court applies its independent judgment in reviewing a lower court's application of law to undisputed facts. *Summers v. Hagen*, 852 P.2d 1165, 1168–69 (Alaska 1993).

■ To obtain summary judgment, the moving party must prove "the absence of genuine factual disputes and its entitlement to judgment." *Shade v. Co & Anglo Alaska Serv. Corp.*, 901 P.2d 434, 437 (Alaska 1995). The non-moving party need not demonstrate the existence of a genuine issue "until the moving party makes a prima facie showing of its entitlement to judgment on established facts." *Id.*

■ FNBA moved for summary judgment on two grounds: the absence of a breach, and the absence of damages. Either one would be sufficient to justify summary judgment in favor of FNBA. Because the trial court granted summary judgment without specifying its reasons, we must examine both possible grounds for summary judgment, and affirm the superior court's decision if FNBA has established, as a matter of law, either the absence of a breach or the absence of damages. *See State v. Appleton & Cox of Cal., Inc.*, 703 P.2d 413, 414 (Alaska 1985) ("When a court grants summary judgment without stating its reasons, it is presumed that the court ruled in the movant's favor on all the grounds stated.").

### B. FNBA May Have Breached the Merchant Agreement.

ATS alleged that FNBA breached the agreement in two ways: by refusing to honor charge slips for RTC coupons and memberships, and by terminating the agreement without notice. We conclude that FNBA failed to establish as a matter for summary judgment the absence of a breach on either ground.

### 1. Refusal to Process RTC Charge Slips

■ The first alleged breach is FNBA's refusal to honor charge slips for RTC coupons and memberships. FNBA admits refusing to honor those slips, but claims that both the contract and the law permit its refusal.

A credit card transaction involves four parties: the consumer, the merchant, and a bank for each of them (known as the issuer and the merchant bank). Four contracts support the transaction: the sales agreement between consumer and merchant, the credit card agreement between consumer and issuer, the merchant agreement between merchant and merchant bank (the contract at issue here), and the interchange agreement among banks. Barkley Clark & Barbara Clark, *The Law of Bank Deposits, Collections and Credit Cards* 15–2 to 15–4, 15–8 to 15–16 (1995).

Federal and state consumer credit law regulates the two consumer agreements, governing such matters as solicitation of cards, billing, interest rates, consumer defenses, complaint procedures, and disclosures. Consumer Credit Protection Act, Pub.L. No. 90.321, 82 Stat. 146 (codified as amended in scattered sections of 15 U.S.C.); Truth in Lending Regulations (Regulation Z), 12 C.F.R. § 226 (1995); AS 06.05.209. The merchant agreement, however, is subject to few regulations. Case law on it is also limited. *See Broadway Nat'l Bank v. Barton–Russell Corp.*, 154 Misc.2d 181, 585 N.Y.S.2d 933, 937–39 (Sup.1992).

Under FNBA's interpretation of its merchant agreement with ATS, FNBA may refuse to honor credit card transactions that it finds questionable. The contract does not explicitly say this. It provides that FNBA will pay ATS "as to all card sales," and defines "card sale" as "a legal sale ... completed in every respect." FNBA argues that ATS's sales were not "in accordance" with the contract because they were not "card sales." According to FNBA, the sales were not "completed" or "legal."

FNBA argues that its agreement with ATS expressly provided that FNBA could

refuse to accept sales slips that were incomplete or illegal. However, the contract did not give FNBA unconditional authority to repudiate any sales it found to be incomplete or illegal. FNBA was contractually obligated to "determine ... a reasonable procedure" for resolving questioned card sales. The contract required FNBA to

> determine ... and instruct [ATS] as to, a reasonable procedure, which the parties will strictly follow,
>
> ... whereby in instances where a sales slip received indicates that the sale, or preparation or transmission of the sales slip, was not in accordance herewith, [FNBA] refrains from paying [ATS], or if payment has already been accomplished, [ATS] repays [FNBA] for account of cardholder.

FNBA claims that the sales were incomplete because the consumers, here the coupon purchasers, had not yet received the airplane flights which were the real service they purchased, "or even tickets ... on an existing, identified scheduled airline." According to FNBA, purchase of a voucher for a future event is not a complete transaction until the certificate or ticket has been exchanged for goods or services. FNBA also contends that its transactions with ATS were not completed because the consumers who bought the travel coupons might have repudiated the transactions and refused to pay the credit card bill.[2]

---

**2.** The consumer's obligation to repay is subject to claims and defenses the consumer might have against the merchant (ATS) under the sales contract. *See* Clark & Clark, *supra*, at 11–29 to 11–37. ATS's failure to deliver the agreed goods or services is a defense to payment by the consumer. 15 U.S.C. § 1666(b)(3); 12 C.F.R. § 226.12. As long as these defenses remain available, FNBA characterizes the deposit credit given by virtue of the ATS transactions as "provisional" and not "completed."

**3.** The provisions of the Act FNBA claims were violated are set out in AS 45.50.471:

> (b) The terms "unfair methods of competition" and "unfair or deceptive acts or practices" include, but are not limited to, the following acts:
>
> ....
>
> (3) causing a likelihood of confusion or misunderstanding as to the source, sponsorship, or approval, or another person's affiliation,

FNBA cites *First United Bank v. Philmont Corp.*, 533 So.2d 449 (Miss.1988), as support for its argument that FNBA's sales were "provisional" and thus incomplete. *Philmont* involves a factual situation similar to the present case. A merchant which had deposited credit card sales slips with the First United Bank sued when the bank froze the merchant's account because of the bank's concerns about a travel marketing scheme in which the merchant participated. The issue on appeal was whether the bank had the right to place a hold or freeze on the account. *Philmont*, 533 So.2d at 453. The Mississippi Supreme Court held that the merchant could not withdraw the funds in the account "as of right." *Id.* at 457. Characterizing the merchant's deposits as "provisionally credited to the account," the court upheld the bank's right to place a temporary freeze on the account. *Id. Philmont* is of limited value to FNBA since it only supports FNBA's argument that the ATS transactions were not completed, a fact that is not dispositive here. FNBA unquestionably had a contractual right to scrutinize provisional or incomplete sales. But the essential element of its argument in this case—which it was required to establish as a matter of law in order to justify summary judgment—is its contention that the RTC transactions were illegal.

FNBA argues that it proved that the RTC sales violated Alaska's Unfair Trade Practices and Consumer Protection Act.[3] In the

---

connection, or association with or certification of goods or services;

> (4) representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have;
>
> ....
>
> (12) using or employing deception, fraud, false pretense, false promise, misrepresentation, or knowingly concealing, suppressing, or omitting a material fact with intent that others rely upon the concealment, suppression or omission in connection with the sale or advertisement of goods or services whether or not a person has in fact been misled, deceived or damaged; ...

In the trial court, FNBA only argued that subsections (3) and (4) were violated by RTC's coupons. FNBA's citation of subsection (12) in its appellate brief appears to have been an afterthought. At any rate, the trial court was placed at a

trial court, FNBA claimed a sample RTC travel coupon showed "on its face" that the sales violated the Act, as the coupon did not disclose that Commonwealth was the sponsor and owner of both RTC and the airline whose ticket RTC would exchange for the coupon, and did not reveal that no schedule of flights existed when the coupon was sold. Aside from arguing that "on its face" the coupon showed an illegal transaction, FNBA's motion provided little or no explanation of its illegality argument.

On appeal FNBA once again argues that the coupons "appear" to violate AS 45.50.471. It says that the coupons did not reveal that no schedule of flights existed when the coupons were sold, that the seller merely hoped there would be scheduled flights in the future, that RTC concealed its true ownership and identity and that of the "airline" it was promoting, and that the coupons falsely implied that RTC had some connection with an airline that actually existed which would honor the RTC coupons.

FNBA's concerns about RTC's operations were shared by the consumer protection section of the state attorney general's office. In January 1988—at the same time, essentially, that FNBA was deciding to reject ATS's credit card purchase slips—the attorney general was investigating RTC's dealings with consumers.

RTC provided the attorney general with certain voluntary assurances. RTC promised to deposit all credit card payments in an escrow account at a local bank. It agreed not to withdraw more than fifteen percent of payments and agreed that these funds would only be withdrawn after an airline had issued its own tickets to the actual purchasers in redemption of RTC's coupons. It agreed to refund purchase money to all buyers unless it sold at least 1200 coupons before March 1, 1988. It agreed to disclose in its advertising its refund agreement, and it agreed to refund all coupon payments and membership fees

paid by buyers who had bought before the advertising disclosure had been made. Its promises were stated in a letter of agreement drafted by the attorney general.

The letter of agreement was signed on January 29, 1988. FNBA rejected the ATS sales slips on January 27 and 28. FNBA knew that RTC had discussed the legality of RTC's operations with the attorney general. Allen Lively, FNBA's vice president in charge of the bank's card lending department, noted that he was told by Les Reynolds, ATS's president, on January 28 that after RTC's contact with the attorney general's office, "everyone is satisfied deal is legit." In response, Lively noted, "[t]old him too late, we don't want anything to do with Rainbow Travel." FNBA made no further investigation regarding RTC's contacts with the attorney general and it made no further attempts to determine whether RTC's marketing schemes were illegal.

While RTC's and ATS's contacts with the attorney general did not result in state approval of RTC's operations, neither did they result in a finding of illegality. The attorney general's office did not characterize RTC's sales as illegal and it did not file suit against RTC, ATS, or their associates.

FNBA argues here that its refusal to process ATS's sales slips was "justified by its well-founded doubt as to the legality of the sales," since the coupons "appear on their face to violate [Alaska's consumer protection] statutes." Its arguments on appeal as well as in the trial court inadequately address the complex factual and legal issues that are involved. In such circumstances, remand to the trial court for further consideration of both parties' arguments is appropriate. *See State v. Grogan,* 628 P.2d 570, 574 (Alaska 1981) ("Since this question [whether certain practices of a party violated AS 45.50.471(b)] has not been adequately briefed in this appeal we leave it to the parties to brief the matter upon retrial in the superior court.").[4]

disadvantage if it was being asked to grant summary judgment on the basis of a statutory provision FNBA felt it unnecessary to identify.

**4.** Briefing by both parties on this issue has been inadequate. For example, ATS has argued that FNBA does not have standing in this case to

assert violation of the consumer protection statutes as a defense. It cited no case law in support of its position in the trial court and it has simply dropped the argument on appeal.

Although legality of the transactions at the time of FNBA's actions was a very legitimate cause for concern and reasonable protective measures, FNBA did not establish as a matter of law that the transactions were illegal or that its conduct under the circumstances was reasonable. If the trial court's summary judgment order was based on FNBA's illegality argument, the order was erroneously entered.

In summary, FNBA was obligated to handle questioned transactions reasonably. It could not avoid its contractual obligations by merely characterizing the sales as incomplete or illegal. Although it had the right to refrain from paying ATS for card sales that were not "completed," the Merchant Agreement did not give it that right unfettered by its obligation to determine reasonably whether payment should be made. It had the right also to question the legality of sales, but not to do so unreasonably. FNBA's obligation to institute reasonable procedures for handling questioned transactions and to make reasonable determinations regarding disputes that might arise in connection with the merchant agreement governed all of its contractual dealings with ATS. As it did not establish an absence of genuine issues of material fact regarding breach of the merchant agreement, its motion for summary judgment was erroneously granted.

### 2. Termination of the Agreement without Notice

■ ATS's second allegation of breach is that FNBA terminated the agreement without giving proper notice. The contract required FNBA to give "written notice of termination sent [to ATS] at least 30 days prior to [the] date of termination."[5] FNBA never gave written notice of termination of the merchant agreement. ATS claims that FNBA terminated the contract by rejecting all credit card transactions from ATS. FNBA contends that it did not terminate the contract and that ATS could still process non-RTC charge slips.

ATS supported its termination claim in the trial court with evidence that it could no longer have credit card transactions approved through the central credit card authorization bureau. It also presented evidence that FNBA flagged the ATS account and that it did not tell ATS that non-RTC charges would be accepted.

FNBA presented evidence that the bank told ATS, orally and in writing, that it refused to accept *only* RTC charge slips rather than *all* charge slips, and implied a continuing contractual relationship when its vice president wrote to the president of ATS, "[w]e do value our relationship with you and with Alaska Travel Specialists...." FNBA further states that the central authorization bureau told ATS only that its merchant number was no longer valid, not that the agreement was terminated. Finally, the distinction between refusal to accept RTC charge slips or all charge slips seems hardly to have concerned ATS; ATS did not investigate further than two calls to the authorization agency, it never called FNBA to discuss the matter, and it never subsequently tried to process any non-RTC charge slips through FNBA.

The conflicting evidence presented raised genuine factual issues. As FNBA's evidence was not sufficient to prove the absence of genuine issues of material fact, summary judgment should not have been granted on ATS's termination claim.

### C. FNBA Has Not Established the Absence of Damages.

■ ATS was an established business at the time FNBA refused to honor its credit card sales. It claimed damages, in the form of lost profits, of approximately $40 million because of FNBA's actions. It also claimed damages in the form of lost revenues from ATS sales.

In the twenty-three months it had done business, ATS had never made a profit. Doyle Reynolds, ATS's president, testified that he had prepared a schedule of projected revenue which estimated ATS's annual profit

---

**5.** FNBA argues that ATS has waived this argument by not briefing it adequately. While it is true that ATS's briefs are weak as they discuss this issue, we do not consider them so deficient that the argument is waived.

from its projected reservation center for WCE flight operations at $1,218,393 per year. Over fifteen years, he estimated lost profits from the reservation center at $36,-551,790. He added $12,000,820 for ATS's lost commission sales over the same period. He admitted an $8 million mistake in his calculations, which would have reduced the sum of his estimate by that figure.

FNBA moved for summary judgment on damages. In its motion it conceded that it had refused to honor $27,858 in ATS sales. It said "[d]oubtless some of those sales were lost, but some people who had used Mastercard or VISA to buy Rainbow memberships and coupons subsequently made payment by other means." FNBA characterized ATS's estimate of profits as "the product of the wildest speculation and surmise." Arguing that neither ATS nor any other organization had previously established a reservation center business such as ATS was planning to conduct, FNBA argued that ATS could not show a profit history from a substantially similar business run by plaintiff or from the same business run by a predecessor and therefore could not recover a loss of profits. *See Guard v. P & R Enterprises*, 631 P.2d 1068, 1072–73 (Alaska 1981). FNBA also argued that ATS's failure to make a profit over its short history should defeat its claim of lost income from commission sales.

ATS argued that FNBA had conceded $27,858 in rejected credit card sales. ATS recited its plans for future operations and argued in conclusory fashion that it would have received commission revenue and the reservation center would have been available as a profit maker if FNBA had not breached its agreement. ATS summarized its opposition by saying it had "shown that there is some certainty of damages, at least with regard to the commissions due on the credit card sales presented to [FNBA]." [6]

The record supports FNBA's characterization of ATS's lost-profits claims as wildly speculative. An award of lost profits is not appropriate if it is the result of speculation. *Guard*, 631 P.2d at 1071 (citing *Dowl-*

*ing Supply & Equip., Inc. v. City of Anchorage*, 490 P.2d 907, 909–10 (Alaska 1971)). FNBA presented evidence sufficient to show the speculative nature of ATS's lost-profits claim. This placed the burden on ATS to show that it could produce evidence sufficient to establish a genuine issue of fact. *See State Dep't of Highways v. Green*, 586 P.2d 595, 606 n. 32 (Alaska 1978). It did not do so. Therefore, summary judgment against ATS was appropriate with respect to its claim of lost profits.

ATS claimed more than lost profits, however. It also claimed loss of revenue arising from FNBA's rejection of $27,858 in credit card sales. FNBA conceded that "some" sales were lost, but argued that "some" of the damages had been mitigated by the buyers' payment by other means. FNBA also argued that no commissions were paid on the sales themselves, while ATS's evidence tended to indicate that commissions would have been paid if the rejections had not occurred and if its business had not been destroyed by FNBA's actions.

If a party moving for summary judgment does not meet its initial burden of showing no genuine issues of fact, the opposing party has no obligation to respond with evidence of its own. *Weaver Bros., Inc. v. Chappel*, 684 P.2d 123, 126 (Alaska 1984). The available evidence did not negate the existence of some financial damage resulting from FNBA's rejection of the sales slips. Summary judgment on the entire damage claim was error.

## IV. CONCLUSION

To obtain complete summary judgment, FNBA was required to show the absence of any genuine issue of material fact on either of two issues: that it did not breach the contract, or that ATS suffered no damages. FNBA's evidence and arguments were insufficient on both issues. Therefore, the court's order of complete summary judgment in favor of FNBA was incorrect. We REVERSE that order, and REMAND this case to the

---

**6.** ATS's president had testified that the commissions "would have come later when they were

converted into tickets."

trial court for further proceedings in accord with this opinion.

MATTHEWS, J., not participating.