Stephen C. RUBRIGHT, Appellant,

v.

Adeline M. ARNOLD, Appellee.

No. S–7010.

Supreme Court of Alaska.

Feb. 19, 1999.

Rehearing Denied March 18, 1999.

William T. Ford, Anchorage, for Appellant.

Mary Louise Molenda, Ruskin & Molenda, Anchorage, for Appellee.

Before MATTHEWS, Chief Justice, and COMPTON, EASTAUGH, FABE, and BRYNER, Justices.

## OPINION

MATTHEWS, Chief Justice.

### I. INTRODUCTION

Adeline Arnold sued Stephen Rubright, claiming that Stephen is the biological father of her son Christopher. She sought a judgment for past and future child support. The superior court entered a final judgment which found Stephen to be the father of Christopher. He was adjudged liable for child support arrearages of $94,578, including prejudgment interest, and attorney's fees of $11,578.80. Stephen was ordered to pay future child support of $658.18 per month.

### II. FACTS AND PROCEEDINGS

Christopher was born in 1987. At that time Adeline was married to Thomas Arnold and listed him as Christopher's father on the birth certificate. Adeline and Thomas are the parents of two older children. A fourth child was born to Adeline in 1990. Thomas and Adeline dispute the parentage of this child, but their dispute is not an issue in this case. Thomas and Adeline separated in 1989. They had not divorced as of the date the final judgment was entered in this case.

In 1991 Adeline's attorney contacted Stephen and communicated her claim that he is Christopher's biological father. In November 1991 Stephen paid Adeline $500 for child support. On September 3, 1992, Stephen signed an affidavit of paternity, certifying that he is the natural father of Christopher.

Adeline filed the complaint in this action on October 6, 1992. Stephen denied paternity and moved to dismiss the complaint, arguing that relief could not be granted without Thomas and Christopher both being made parties to the action. In response, the superior court ordered that the case would be dismissed unless Thomas was made a party. Adeline amended her complaint, adding a claim against Thomas for divorce, custody of the other three children, and child support.

On July 16, 1993, the trial court ordered Stephen to undergo blood testing to determine the paternity of Christopher. When Stephen did not comply, Adeline moved for an order to show cause why he should not be held in contempt. The court granted this motion on September 9, permitting Stephen to purge his contempt by submitting proof of blood testing within an additional ten days.

Thomas prepared a pro per answer. Adeline's counsel received this on October 8. When it became apparent that it had not been filed in court, Adeline's counsel filed it on November 3. Thomas's answer did not respond to Adeline's allegation that Stephen is Christopher's father.

On October 13 Stephen, who had not obeyed the trial court's order requiring blood testing, moved for a stay of proceedings until "a final decision has been made regarding Christopher Arnold's legitimacy." Adeline opposed, arguing that a stay was inappropriate since the objective of the blood testing was to determine Christopher's paternity. In response, Stephen argued that it was essential that the court appoint a guardian ad litem to represent Christopher's best interests. The trial court denied Stephen's motion for a stay and ordered the parties to appear at a hearing before a master to determine issues relating to whether Thomas should be estopped from denying paternity.

The master's hearing was held on January 5, 1994. Adeline appeared, and Stephen appeared through counsel and was available for testimony telephonically. Thomas did not appear. The master reported that Adeline admitted that she falsely identified Thomas Arnold as Christopher's father at birth and put Mr. Arnold's name on the child's birth certificate. She added that she did not tell Mr. Arnold about her extramarital relationship with Stephen Rubright and did not tell Mr. Arnold until a year after Christopher's birth that he was not the father of that child. She said that after so informing Mr. Arnold he "backed away" from a relationship with Christopher and has twice visited two of the other Arnold children but not Christopher since the parties' separation in 1989. She also believes that Mr. Arnold had a paternity blood test performed in Seward, Alaska in approximately September of 1990, and that she understood the test result indicated that Mr. Arnold is not Christopher's father.

Adeline again moved for an order to show cause, requesting sanctions for Stephen's failure to take a blood test. On June 10, 1994, the superior court granted the motion and ordered that Stephen would be adjudicated Christopher's biological father unless he submitted to paternity tests within thirty days. Stephen sought reconsideration of this order, indicating that he would decline to take the blood test on advice of counsel since the child was not illegitimate, and again requesting a guardian ad litem to represent Christopher. The motion for reconsideration was denied. Stephen then petitioned this court for review. His petition was denied.

On November 18 Adeline moved for a declaration that Stephen is the legal father of Christopher. Stephen still had not taken a blood test. Adeline submitted blood-test results with her motion, which showed that Thomas is not Christopher's father. Stephen opposed the motion, again on the ground that Thomas is Christopher's presumed father. Again, Stephen asked that the court appoint a guardian ad litem for Christopher. On December 9, 1994, the court granted Adeline's motion for a declaration that Stephen is Christopher's legal father.

The court then sua sponte dismissed Thomas as a party to the action. Stephen moved for reconsideration of the paternity order on the grounds that the blood test concerning Thomas was not authenticated as required in *Mattox v. State, CSED*, 875 P.2d 763 (Alaska 1994). This motion was denied. The court indicated that the order establish-

ing Stephen's paternity was both a sanction for Stephen's willful failure to submit to blood testing and a determination on the merits based primarily on Stephen's signed and notarized acknowledgment of paternity. The court also stated that Thomas's blood testing was not a basis for the court's order.

Stephen sought to appeal the paternity order, and requested a certification of finality pursuant to Civil Rule 54(b). The court denied a Rule 54(b) certificate, finding that there was no reason to sever the issue of paternity from that of support, and noting that Stephen "can still submit to [blood] testing and challenge the court's finding [of paternity]." Subsequently, the amount of support Stephen owed was determined by motion practice, and arrearages were calculated from Christopher's date of birth. Finally, the court awarded attorney's fees to Adeline under Civil Rule 82.

## III. DISCUSSION

### A. Did the Court Err in Determining that Stephen Is the Father of the Child?

Stephen's arguments on this point are that (1) it was inappropriate to sanction Stephen with an order declaring him to be Christopher's father because Thomas's paternity was never disestablished and this case is distinguishable from the case on which the superior court relied, Dade v. State, CSED, 725 P.2d 706 (Alaska 1986); (2) Adeline was estopped to deny paternity because she placed Thomas's name on the birth certificate and represented "for several years thereafter that Thomas Arnold was Christopher's father"; (3) Thomas should be estopped from denying paternity because he was not properly made a party, and has never denied paternity or given sufficient evidence that he is not the father; and (4) Stephen's signing of the affidavit of paternity was without legal effect as a legitimating act under AS 25.20.050(a). We discuss each argument in turn.

It is our view that the order establishing paternity was correct, both as a sanction and on the merits.

■ As a sanction, the order was correct because Stephen willfully refused to take a blood test. He was first ordered to do so on July 16, 1993, the order was later twice repeated, and Stephen was given explicit notice in the order of June 10, 1994, that he would be adjudicated to be the biological father of Christopher if he did not schedule and submit to paternity testing within thirty days. Nonetheless, he at all times refused testing.

■ In Dade, we upheld a sanction entered as an order establishing paternity where the putative father had arranged for a friend to submit blood for testing in response to a discovery order. 725 P.2d at 708. We noted that establishment orders are justified where the failure to comply with a discovery order is willful, in the sense of "a conscious intent to impede discovery." Id. (citing Hawes Firearms Co. v. Edwards, 634 P.2d 377, 378–79 (Alaska 1981)). We found the putative father's conduct in that case to be egregious since he attempted to provide false evidence to the court. Id. In the present case, the element of false evidence is missing. Stephen seeks to distinguish the instant case from Dade on this basis.

While Dade is factually distinguishable, this case also presents a refusal to submit to blood testing which is willful, and in which the failure to submit can fairly be described as egregious in light of the several iterations of the court's order and the considered nature of Stephen's refusal.

Stephen also argues that the sanctions were inappropriate because Christopher was born to Adeline while she was married to Thomas. Although Stephen does not develop this argument, he evidently means that in paternity suits with a presumptive father, the presumption must first be rebutted before discovery can take place requiring a blood test from the putative father. Stephen cites no precedent suggesting such mandatory bifurcation, and we see no reason for such a rule.[1] The putative father's blood test may

---

1. We note, however, that under the Uniform Parentage Act the presumption of paternity must first be rebutted before paternity by another man first be rebutted before paternity by another man may be determined in the same action. Unif. Parentage Act § 6(a)(2), 9B U.L.A. 302 (1987). The uniform act has not been adopted in Alaska,

be relevant not only to establishing the paternity of the putative father, but also to rebutting the presumption of paternity in the presumed father.

We thus reject both of Stephen's arguments concerning the establishment order as a sanction.

■ Turning to the establishment order on the merits and treating it as the product of motion practice equivalent to a motion for summary judgment, the order must also be affirmed.

To obtain summary judgment, the moving party must demonstrate the absence of genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. *See Alaska Travel Specialists, Inc. v. First Nat'l Bank of Anchorage*, 919 P.2d 759, 762 (Alaska 1996). The opponent to the motion need not demonstrate the existence of a genuine issue until the moving party makes a prima facie showing of its entitlement to judgment on the established facts. *See id.*

Adeline made a prima facie showing that Stephen is the father of Christopher. She relied on the evidence which had already been submitted, including her sworn testimony before the master that Stephen is the father and the sworn acknowledgment of paternity which Stephen had signed. In response, Stephen filed no affidavits and no statement of genuine issues. His defense was legal rather than factual in nature. He stated: "[Stephen] does not know whether he is the biological father of Christopher Arnold, and at this point he is not interested in

knowing. Christopher has a legal father and has had a legal father since he was born." There were, then, no genuine factual issues which would serve to prevent summary judgment.[2]

■ Turning to Stephen's legal arguments concerning the merits of the summary judgment adjudication, he first argues that Adeline was estopped to deny paternity because she named Thomas as the father when Christopher was born and represented for "several years" thereafter that Thomas was the child's father.

■ The elements of equitable estoppel are (1) representation of a position by word or deed, (2) reasonable reliance thereon by another party, and (3) detriment or prejudice to that party. *See K.E. v. J.W.*, 899 P.2d 133, 134 (Alaska 1995). Assuming, without deciding, that estoppel of the mother might under some circumstances be appropriate in a paternity case, this defense is legally insufficient under the circumstances of this case, for there is no claim that Adeline made a representation to Stephen, and similarly, no claim of detrimental reliance on the part of Stephen.

■ Stephen's second argument is that Thomas should be estopped from denying paternity because he was not properly made a party, and has not denied paternity or given sufficient evidence that he is not the father. This defense also is insufficient. Thomas was named as a party in this case. He was served, and wrote an answer which

and the bifurcation it mandates does not require that discovery be bifurcated.

**2.** The fact that Thomas is the presumed father of Christopher does not necessarily prevent summary judgment, adjudicating Stephen to be the father. We discussed the relationship between the presumption and summary judgment in *In re J.B.*, 922 P.2d 878, 881 n. 4 (Alaska 1996):

There is a presumption, rebuttable by clear and convincing evidence, that [the husband] is [the child's] father. The effect of this presumption was to shift to the State the burden of going forward with the presentation of evidence. This duplicates the burden that was already imposed on the State as the party moving for relief in the nature of summary judgment. As such, the presumption does not

prevent such relief from being entered if, in consideration of all the evidence including the basic fact giving rise to the presumption—[the husband's] marriage to [the mother] at the time of [the child's] birth—it could not be reasonably concluded that [the husband] was [the child's] father. On this record a conclusion that [the husband] was [the child's] father would be unreasonable. The fact that the presumption is rebuttable only by clear and convincing evidence does not change this conclusion. If there were any evidence sufficient to raise a genuine issue of material fact on the question whether [the husband] was [the child's] father, such evidence would suffice to prevent relief in the nature of summary judgment regardless of the standard of proof to be used at trial. (Citations omitted.)

did not respond to the allegation that he is not the child's father. Under Civil Rule 8(d), the allegation was therefore admitted. Stephen states that this answer "could easily be a complete fabrication by Adeline Arnold." However, this is merely counsel's argument. No effort was made to pursue this possibility through discovery or otherwise in the proceedings below. Further, even if Thomas had not been made a party, Stephen could still be liable. Thomas was not necessarily an indispensable party under Civil Rule 19(a), as it is difficult to see why his absence would prejudice Stephen.

Stephen's third point is that the affidavit of paternity was without legal effect. Under AS 25.20.050(a), a child born out of wedlock may be legitimated by a putative father who acknowledges paternity in writing. Stephen's affidavit was signed on a form designed to accomplish legitimation under this section. Stephen argues that since Christopher was born to a married woman, he was not born "out of wedlock," and therefore could not be legitimated under AS 25.20.050(a). This point may or may not be correct depending on the meaning of the term "out of wedlock" as it is used in the statute. If any child born to a married woman is not born "out of wedlock" regardless of the biological father, then Stephen is correct. If, on the other hand, a child whose mother is married to someone other than the biological father is born "out of wedlock," Stephen may be incorrect.[3] However, it is not necessary to resolve this question because Adeline did not seek to use the affidavit of paternity to establish Christopher's legitimacy under AS 25.20.050(a). Instead, the affidavit was simply used as an evidentiary admission. As such, its use was proper. *See* Alaska R. Evid. 801(d)(2).

B. *Did the Court Err in Refusing to Appoint a Guardian ad Litem for the Child?*

■■■ The superior court has broad discretion in deciding whether to appoint guardians ad litem. *See Veazey v. Veazey*, 560

P.2d 382, 385 (Alaska 1977). The court's decision appointing or declining to appoint a guardian ad litem will not be overturned absent an abuse of discretion. *See W.E.W. v. D.A.M.*, 619 P.2d 1023, 1025 (Alaska 1980).

■■■ Stephen argues that a guardian ad litem for the child should always be appointed in paternity actions involving a claim that the presumed father is not the biological father. He points to many jurisdictions which follow this rule. *See* Unif. Parentage Act § 9, 9B U.L.A. 312 (1987) ("The child shall be made a party to the action. If he is a minor he shall be represented by ... a guardian ad litem ...."); *see also* Danny R. Veilleux, Annotation, *Necessity or Propriety of Appointment of Independent Guardian of Child Who is Subject of Paternity Proceedings*, 70 A.L.R.4th 1033 (1989).

In *W.E.W.*, a paternity action involving an unmarried mother, we held that the trial court did not err in refusing to appoint a guardian ad litem for the infant child. 619 P.2d at 1025. We concluded that the child's rights were adequately protected by the mother, who was suing the putative father for support. *Id.*

We decline to adopt a per se rule which holds that a guardian ad litem must always be appointed in a paternity action involving a mother who was married at the time of the child's birth. Often, a guardian ad litem should be appointed, especially where there are issues such as custody, visitation, or inheritance rights on which the child's and the mother's interests may not coincide. *See Howlett v. Howlett*, 890 P.2d 1125, 1127–28 (Alaska 1995). Here, however, no specific reason for appointment of a guardian ad litem is alleged. The 1994 master's hearing explored the question of the emotional attachment between Christopher and Thomas, and the only evidence that was presented was that Thomas had not visited Christopher—who was then six years old—for more than four years. Stephen does not seek visitation rights. Further, there is no sugges-

---

3. This is the sense in which we seem to have construed the term "out of wedlock" in *State, CSED v. A.H.*, 880 P.2d 1048, 1050 (Alaska 1994). The Uniform Act on Paternity is in agreement: "A child born out of wedlock includes a child born to a married woman by a man other than her husband." Unif. Act on Paternity § 1, 9B U.L.A. 350 (1987).

tion that Christopher is losing valuable inheritance rights as a result of the judgment.[4]

Finally, even if we were to conclude that a guardian ad litem should have been appointed in this proceeding, we would not reverse this case absent a showing by Stephen that the court's refusal to appoint a guardian ad litem affected Stephen's substantial rights.[5] No such showing has been made.

C. *Did the Court Err by Awarding Adeline Child Support from the Date of Christopher's Birth?*

 Stephen argues that his child support obligation could only begin on December 10, 1994, when the trial court found him to be Christopher's father, because Thomas was Christopher's legal father before that time. We reject this argument.

 In *State, CSED v. Rios*, 938 P.2d 1013, 1015 (Alaska 1997), it was argued that a biological parent's duty of support for a child born out of wedlock does not begin until a court has adjudicated paternity. We rejected this argument, holding instead that a parent's duty of support "commences at the date of the birth of the child." *Id.* Likewise, in *Flanigin v. State, CSED*, 946 P.2d 446, 450 (Alaska 1997), we recognized the rule that "child support arrearages are imposable by law from the date of a child's birth...." These cases control the present case.

We also acknowledge that this ruling has a potential for unfairness in particular cases. If a biological father has no notice of his paternity until many years after the birth of a child, child support arrearages may be economically crushing. The father may have no means, except avoiding conception, of protecting himself. Large and unexpected liabilities can be the logical consequence of the rule that a biological father is liable for the support of a child from birth, especially when past arrearages are based on the child support guidelines set out in Civil Rule 90.3,

rather than on reimbursement of past expenses. *See Vachon v. Pugliese*, 931 P.2d 371, 381–82 (Alaska 1996). However, these principles are well established in our case law. Further, many other jurisdictions hold that a father's liability for support extends from the birth of the child. *See, e.g., W.M. v. D.S.C.*, 591 A.2d 837, 843 (D.C.1991); *Department of Revenue v. Roe*, 29 Mass.App.Ct. 967, 560 N.E.2d 1288, 1289 (1990); *Wingate v. Estate of Ryan*, 149 N.J. 227, 693 A.2d 457, 463 (1997); *Kathy L.B. v. Patrick J.B.*, 179 W.Va. 655, 371 S.E.2d 583, 589 (1988). If relief from the potentially harsh consequences which we have noted herein is to be afforded, it must come from the legislative rather than the judicial forum.

D. *Did the Court Err in Awarding Attorney's Fees Pursuant to Civil Rule 82?*

 With respect to this point, Stephen argues that the divorce exception to Civil Rule 82 should apply. He cites *Bergstrom v. Lindback*, 779 P.2d 1235, 1238 (Alaska 1989), in which we held that the divorce exception, instead of Rule 82, applies to proceedings involving child custody and support between unmarried persons. *Bergstrom* was similar to a divorce case because the parties had lived together as husband and wife for many years and had two children. *Id.* at 1236. When they decided to separate, questions of custody and support arose just as they would have between married parties. It was therefore logical to apply the same rule concerning attorney's fees to *Bergstrom* as is applied to divorce cases. This case, however, does not resemble a divorce action. There exists here no reason to apply the divorce exception even as extended by *Bergstrom*. *See B.J. v. J.D.*, 950 P.2d 113, 118–19 (Alaska 1997) (refusing to apply the *Bergstrom* divorce exception to a custody proceeding filed three years after the parties ended their relationship because it "does not bear the same close resemblance

---

**4.** Since Christopher was not a party, an adjudication having the effect of disinheriting him would not necessarily be binding on him in any event. *See, e.g., Ex parte Martin By and Through Sarris*, 565 So.2d 1, 3 (Ala.1989).

**5.** Civil Rule 61 provides that any error or defect in a proceeding "which does not affect the substantial rights of the parties" is harmless error

and is not a ground for vacating a judgment. While Stephen has argued that a guardian ad litem was necessary to protect the child's best interests, he has made no argument suggesting how his substantial interests might have been affected by the court's failure to appoint a guardian ad litem.

to an initial custody proceeding in a divorce action as did *Bergstrom* ").

## IV. CONCLUSION

For the above reasons the judgment is AFFIRMED.

BRYNER, Justice, with whom
COMPTON, Justice, joins, concurring.

I concur in affirming the disputed paternity judgment, but only on the ground that it was an appropriate sanction for Rubright's refusal to take a blood test. In my view, it is both unnecessary and unwise to reach beyond the issue of sanctions by upholding the paternity order on its merits.

When it imposed the disputed judgment, the trial court expressly stated that Rubright could "still submit to [blood] testing and challenge the court's finding [of paternity]." Thus, the trial court did not mean the judgment to be a true litigation-ending sanction; rather, the court meant to leave Rubright the keys to reopen his case. In my view, the judgment is defensible only if it is interpreted as it was intended to be—as a non-terminal sanction.[1] Construing the judgment to be a non-terminal sanction also renders defensible the court's decision not to appoint a guardian ad litem. As a reversible measure aimed chiefly at encouraging compliance, the paternity judgment simply defers the guardian ad litem issue until Rubright complies with the court's directives, preserving the status quo in the interim.

By contrast, if the disputed judgment were construed as a conclusive resolution of the case on its merits, its validity would seem highly questionable. I will concede for argument's sake the doubtful proposition that Rubright's promise to pay Adeline support and his subsequent affidavit of paternity are, standing alone, clear and convincing evidence that he is actually Christopher's biological father. Even so, several other factors weigh strongly against upholding the trial court's decision on its merits rather than as a sanction. First, the disputed judgment purports to establish the paternity of a previously unrecognized father without first disestablishing paternity of the present, legally presumed father.[2] Second, the court entered this order without the presumed father's participation and without an evidentiary hearing. Finally, despite a decidedly unusual set of relational dynamics,[3] the court acted without expressly considering Christopher's best interests or requiring his interests to be represented independently from his mother's.[4]

These considerations counsel me to refrain from affirming the paternity judgment as anything other than a non-terminal sanctions order. Affirming the judgment on this narrow ground is fully sufficient to resolve this appeal and gives the judgment the limited effect that the superior court intended it to have; at the same time, affirming on this narrow ground avoids an unnecessary venture onto shaky legal terrain.

---

1. Although Rubright's wilful and obstinate disobedience certainly deserved strong sanctions, I am convinced that imposing a true litigation-ending sanction against him would have been improper, since other less drastic sanctions, such as civil contempt, were readily available. *See, e.g., Sykes v. Melba Creek Mining, Inc.*, 952 P.2d 1164, 1169–70 (Alaska 1998).

2. Although Rubright does not brief the issue, I find it hard to think of any reason to reject the Uniform Parentage Act's rule requiring a presumed parent's paternity to be disestablished before a new parent's paternity can be established. *See* Unif. Parentage Act § 6(a)(2), 9B U.L.A. 302 (1987). The court's opinion correctly notes that adopting the UPA's approach would have permitted discovery to proceed in the paternity action against Rubright. *See* Op. at 583–584. The UPA's approach would thus be compatible with upholding the trial court's order as a sanction.

But it could not justify entering a final order establishing his paternity without a prior ruling disestablishing existing paternity.

3. Adeline's mention of Thomas's "backing away" from a relationship with Christopher is nebulous at best, but it does imply that at least some relationship existed between Thomas and Christopher. By contrast, it seems clear that no relationship at all existed between Christopher and Rubright. No other meaningful evidence concerning Christopher's relationships or best interests was presented.

4. Adeline's somewhat abrupt determination to sever all ties to Thomas and demand support from Rubright suggest action motivated by her own economic and emotional interests; the record provides little assurance that she was acting in Christopher's best interests.

I thus concur with the court's decision but decline to join in the portion of its opinion affirming the judgment on its merits.