STATE of Alaska, DEPARTMENT OF REVENUE, CHILD SUPPORT ENFORCEMENT DIVISION, Appellant and Cross–Appellee,

v.

Dusan D. KOVAC, Appellee and Cross–Appellant.

Nos. S–8423, S–8424.

Supreme Court of Alaska.

Aug. 6, 1999.

Scott Davis, Assistant Attorney General, Fairbanks, and Bruce M. Botelho, Attorney General, Juneau, for Appellant/Cross–Appellee.

Rita T. Allee, Fairbanks, for Appellee/Cross–Appellant.

Before MATTHEWS, Chief Justice, COMPTON, EASTAUGH, FABE, and BRYNER, Justices.

## OPINION

BRYNER, Justice.

### I. INTRODUCTION

R.M. was born to the marriage of Richard Romer and Darlene Wright; Romer was thus presumed to be R.M.'s father. Romer and Wright later separated and divorced. Several years afterward, the superior court ruled that Romer was not R.M.'s father and owed him no duty of support. Wright subsequently identified Dusan Kovac as R.M.'s father. After genetic testing confirmed the identification, the court entered summary judgment (1) rejecting Kovac's claim that Romer is R.M.'s father by estoppel, (2) establishing Kovac as the father, and (3) ordering him to pay R.M.'s support from May 1996, when the court had declared that Romer was not R.M.'s father. We affirm in part and reverse in part. Because Kovac failed to join Romer as a party to this action and offered

no evidence of estoppel, we hold that the court properly established Kovac's paternity. But because a father's duty of support arises upon the birth of his child, we hold that Kovac owes R.M. support from birth.

## II. *FACTS AND PROCEEDINGS*

In 1988, after sixteen years of marriage, Darlene Wright filed for divorce from Richard H. Romer. Wright's complaint listed four children born of the marriage, the youngest being three-year-old R.M. Romer answered the complaint, acknowledging that all four of Wright's children were born of the marriage. The following year Wright amended her complaint to assert that R.M. was not born of the marriage. R.M. was never mentioned again in the divorce proceedings.

Wright and Romer eventually settled all issues of support, custody, visitation, and property/debt division. Their settlement agreement, incorporated in a divorce decree issued in Anchorage on February 22, 1991, made no provision for R.M.'s custody or support.

In 1992 the case was transferred from Anchorage to Bethel—where Wright lived—for consideration of various child support issues. Superior Court Judge Dale O. Curda in July 1993 ordered Romer to pay arrearages and increased his child support obligation to reflect his increased income. There is no indication that anyone mentioned R.M. during these proceedings. After Judge Curda issued the July 1993 order, Wright applied to the Child Support Enforcement Division (CSED) for assistance in collecting support from Romer. In her application she listed her three oldest children but did not refer to R.M.

In 1996, with CSED's assistance, Wright moved to modify the child support order. Romer opposed Wright's motion. Evidently believing that the motion sought an order requiring him to pay support for R.M., Romer filed an affidavit declaring that he was not R.M.'s biological father, that Wright had told him R.M. was not his son when they separated in 1988, and that he no longer maintained any relationship with R.M. Romer offered to submit to a blood test to establish that he

was not the boy's father. Claiming that he had second-hand knowledge of the father's identity, Romer also suggested that the putative father "could be available for paternity testing." In addition to filing this affidavit, Romer served Wright with a request for admission, asking her to acknowledge that Romer is not R.M.'s biological father.

Wright did not reply to Romer's affidavit or answer his request for admission. In May 1996, based on Romer's affidavit and Wright's failure to respond, Judge Curda entered an order declaring that Romer was not R.M.'s biological father and owed him no duty of support:

> Plaintiff's minor child, [R.M.], born April 4, [1985,] is not a child of the marriage and Defendant, RICHARD H. ROMER owes no child support and has no child support obligation for this child.

Five months later, Wright signed an affidavit naming Dusan D. Kovac as R.M.'s biological father. CSED filed a complaint against Kovac in Fairbanks (where he resided) seeking to establish that he was R.M.'s biological father. Genetic testing later established a 99.85% probability of Kovac's paternity.

After receiving this test result, both parties moved for summary judgment in the paternity action. CSED, arguing that the test proved that Kovac was R.M.'s biological father, requested an order establishing his paternity and his duty to support R.M. from the date of the child's birth. Kovac, pointing out that Romer was presumed to be R.M.'s legal father because R.M. was born during the Romers' marriage, maintained that since Romer's paternity had never been formally disestablished, Romer was liable for R.M.'s support. Kovac further maintained that Romer was equitably estopped from denying paternity and should therefore remain liable for support.

The paternity action was assigned to Superior Court Judge Ralph R. Beistline in Fairbanks. The judge granted partial summary judgment in CSED's favor and denied summary judgment to Kovac. Judge Beistline found that the superior court in Bethel had effectively disestablished Romer's paternity

in May 1996 when it declared that R.M. was not a child of the Romers' marriage. Judge Beistline further found that the recent blood test clearly and convincingly established Kovac's biological paternity and that Kovac had failed to present sufficient evidence to justify a trial on his claim that Romer should be estopped from denying paternity. Accordingly, the judge declared Kovac to be R.M.'s father and directed him to pay R.M.'s support from the date of the Bethel order forward.

CSED appeals; Kovac cross-appeals.

## III. DISCUSSION

### A. Standard of Review

■ CSED challenges the superior court's refusal to hold Kovac liable for R.M.'s support from the date of his birth. Kovac claims that his own paternity cannot properly be established because Romer's paternity has never been validly disestablished; he further maintains that the court erred in summarily rejecting his estoppel claim. These arguments present issues of law arising on settled facts. We review legal questions de novo, adopting the rule of law most persuasive in light of precedent, reason, and policy.[1]

### B. The Superior Court Erred in Deciding that Kovac's Duty to Pay Support Began When Judge Curda Disestablished Romer's Paternity Instead of When R.M. Was Born.

CSED argues that the superior court erred in ruling that Kovac's duty to support R.M. attached as of May 22, 1996, the date that Judge Curda effectively disestablished Romer's paternity. CSED insists that Kovac's child support duty arose upon R.M.'s birth, persuasively arguing that State, CSED v. Rios[2] controls the issue. In Rios, relying upon statutory and common law, we held that

"a biological parent's duty of support commences at the date of the birth of the child."[3]

In declining to follow Rios, Judge Beistline distinguished that case, which dealt with a child whose father had not been identified before the court established his paternity.[4] He contrasted the facts in Rios from the present case, in which "[R.M.] was born to a marriage and thus the presumption at birth was that [Romer] was the father." In drawing this distinction, the judge focused on a passage from Rios that states: "[A]lthough an adjudication of paternity may be a prerequisite to enforcement of a duty of support, it does not create the duty of support."[5] Judge Beistline evidently took this passage to mean that a child's newly-established biological father can owe no duty of support until the existing legal father's paternity is disestablished. But this reading of Rios is mistaken. The quoted passage from Rios simply emphasizes that, even though the biological father's support duty cannot be enforced until his paternity is formally established, the duty itself arises upon the birth of his child. Rios makes this point clear by quoting the following language from Weaver v. Chester:[6] "[I]t is not the father's obligation to support the child which is made contingent upon an adjudication of paternity but simply the right to enforce that legal obligation through legal process."[7]

Rios thus squarely stands for the proposition that Kovac's duty to support R.M. arose upon R.M.'s birth. As we pointed out in Rios, this proposition reflects sound policy:

[P]recluding [an award from the date of the child's birth] would create an incentive for men to avoid their child support obligations for some period of time by delaying the process of adjudicating paternity. The creation of such an incentive would, of course, run counter to the statutory pur-

---

1. See State, CSED v. Gerke, 942 P.2d 423, 425 (Alaska 1997) (quoting Guin v. Ha, 591 P.2d 1281, 1284 (Alaska 1979)).

2. 938 P.2d 1013 (Alaska 1997).

3. Id. at 1015 (citing AS 25.20.030; Matthews v. Matthews, 739 P.2d 1298, 1299 (Alaska 1987) (superceded by rule in other respects)).

4. See id. at 1014.

5. Id. at 1015.

6. 195 Ga.App. 471, 393 S.E.2d 715 (1990) (superceded by statute in other respects).

7. Id. at 717, quoted in Rios, 938 P.2d at 1015 n. 5 (alteration in original).

pose of providing for the needs of children without regard to circumstances of birth.[8]

More recently, in *Rubright v. Arnold,*[9] we affirmed an order establishing the paternity of a biological father, Rubright. The order held Rubright responsible for child support accruing from the day that his son, C.A., was born.[10] C.A. was born while his mother was married to another man, Arnold, and C.A.'s birth certificate listed Arnold as the father.[11] Accordingly, Arnold was presumed to be C.A.'s parent, and his legal paternity had never been disestablished.[12] By recognizing Rubright's duty to pay support from the date of C.A.'s birth, we effectively held that a presumptive father's paternity need not be disestablished before a newly-established biological father's duty to pay support arises.[13]

■ Together, *Rios* and *Rubright* dictate the conclusion that Kovac's child support duty arose upon R.M.'s birth. Accordingly, we hold that the superior court erred in ruling that the duty began only when Judge Curda disestablished Romer's paternity.[14]

■ Kovac nevertheless argues in his cross-appeal that the superior court erred by summarily rejecting his claim that Romer should be estopped from denying paternity. He asserts that "[w]hile blood testing is a useful tool, the superior court erred by relying solely on the blood test results as dispositive, denying [Kovac] the opportunity to develop the factual basis for an estoppel defense." Although Kovac acknowledges the court's ruling that he had presented insufficient evidence to support this defense, he insists. that "there is enough in the record to preclude denying [his] defense as a matter of law without any effort to hear and consider evidence."

But as CSED points out in response to this argument, Kovac could not properly establish his claim of estoppel against Romer without joining him as a party to the establishment action.[15] Kovac failed to do so.

■ Moreover, Kovac bases his argument on an unduly broad theory of paternity by

---

**8.** *Id.* at 1015 (quoting *Cyrus v. Mondesir,* 515 A.2d 736 (D.C.1986) (first alteration in original)).

**9.** 973 P.2d 580 (Alaska 1999).

**10.** *See id.* at 581, 586.

**11.** *See id.* at 582.

**12.** *See id.* at 581–83.

**13.** *See id.* at 584–85 (expressly stating that Rubright could be liable for C.A.'s support even if Arnold had not been a party to the paternity action).
   This aspect of *Rubright* may seem to be in tension with several cases holding that legal fathers whose biological paternity is disestablished should normally be granted only prospective relief from their child support obligations. *See, e.g., State, CSED v. Wetherelt,* 931 P.2d 383, 387–88 (Alaska 1997). But the tension is more apparent than real: Any potential overlap in child support obligations between a newly-established biological father and a former legal father may be remedied through reimbursement. *See Matthews v. Matthews,* 739 P.2d 1298, 1299 (Alaska 1987) ("A parent's duty of support encompasses a duty to reimburse other persons who provide the support the parent owes.") (superceded by rule in other respects). *Cf. Smith v. Cole,* 553 So.2d 847, 854–55 (La.1989) (recognizing the concept of "dual paternity" in which a child born into a marriage with a non-biological father retains a legal parent/child relationship based on

presumptive fatherhood for purposes of legitimacy and inheritance, while becoming the child of a newly-established biological father for purposes of child support). *See also Flanigin v. State, CSED,* 946 P.2d 446, 450 (Alaska 1997) (recognizing that "child support arrearages are imposable by law from the date of a child's birth").

**14.** CSED alternatively argues that Judge Curda's order did not disestablish Romer's paternity but instead essentially determined that he had never been R.M.'s legal parent and accordingly never owed him a duty of support. Kovac disputes this characterization of Judge Curda's order and insists that, however construed, the order is invalid. Given our conclusion that as R.M.'s biological father Kovac is responsible for his support from the date of R.M.'s birth regardless of Romer's status as a legal parent, we need not address these arguments.

**15.** *See State ex rel. Hopkins v. Batt,* 253 Neb. 852, 573 N.W.2d 425, 432 (1998) ("[The biological father] asserts that the conduct of [the presumed father and mother] should preclude them from denying [the presumed father's] paternity. However, [the presumed father] is not a party to this action and therefore cannot be estopped."); *see also State ex rel. J.R. v. Mendoza,* 240 Neb. 149, 481 N.W.2d 165, 175 (1992) ("[T]he obvious weakness in [the biological father's] theory is that the person he alleges engaged in misrepresentations, [the presumed father], is not a party to this suit.").

estoppel. He suggests that the record supports a conclusion that R.M. and Romer have a close relationship and that R.M. has come to accept Romer as his father. Relying on three cases in which we have previously discussed the doctrine of paternity by estoppel—*K.E. v. J.W.*,[16] *Wright v. Black*,[17] and *H.P.A. v. S.C.A.*,[18]—Kovac appears to assume that Romer would be barred from denying paternity if his denial would cause R.M. emotional harm by violating his reasonable expectation of continuing this relationship. But we have recently narrowed the scope of this equitable defense, holding that paternity by estoppel applies only upon proof of economic reliance and that "the risk of emotional harm inherent in severing a child's relationship with a psychological parent cannot itself suffice as a basis for invoking the doctrine of paternity by estoppel . . . ."[19]

Kovac has failed to allege or produce admissible evidence of any potential economic detriment to R.M. or his mother that might bar Romer from denying paternity. Thus, even assuming that the superior court had authority to decide Kovac's estoppel claim in Romer's absence, its decision rejecting the claim and denying Kovac's motion for summary judgment was proper.

## IV. CONCLUSION

We therefore REVERSE the superior court's partial denial of CSED's motion for summary judgment, AFFIRM its order denying Kovac's motion for summary judgment, and REMAND for entry of a modified judgment directing that Kovac's duty of support be recalculated as having commenced upon R.M.'s birth.

---

16. 899 P.2d 133 (Alaska 1995).

17. 856 P.2d 477 (Alaska 1993).

18. 704 P.2d 205 (Alaska 1985).

19. *B.E.B. v. R.L.B.*, 979 P.2d 514, 520 (Alaska 1999).