**TESSA M., Appellant,**

v.

**STATE of Alaska, DEPARTMENT OF HEALTH & SOCIAL SERVICES, OFFICE OF CHILDREN'S SERVICES, Appellee.**

No. S–12802.

Supreme Court of Alaska.

May 9, 2008.

---

Robert R. Polley, Kodiak, for Appellant.

Megan R. Webb, Assistant Attorney General, Anchorage, and Talis J. Colberg, Attorney General, Juneau, for Appellee.

Before: FABE, Chief Justice,
MATTHEWS, EASTAUGH, CARPENETI,
and WINFREE, Justices.

*OPINION*

WINFREE, Justice.

## I. INTRODUCTION

A mother appeals from an order terminating her parental rights. She argues that the trial court's findings that (1) she had failed to remedy her conduct, and (2) terminating her parental rights was in the child's best interests, are clearly erroneous and therefore the court had no legal basis to terminate her parental rights. The trial court's findings are supported by the evidence presented at trial, and we affirm the termination of parental rights.

## II. FACTS AND PROCEEDINGS

Tammy is the daughter of Tessa and Tom.[1] Tammy was almost three years old when in April 2005 she suffered severe immersion burns from scalding water at the family's home.[2] Tessa had been at work but returned home when Tom called for help. Tessa and Tom then took Tammy to Fort Wainwright's Basset Army Hospital emergency room; the next day she was transferred to the Trauma Burn Unit at Harborview Hospital in Seattle, Washington. Tammy was treated at Harborview for life-threatening burns and related complications for two and one-half months.

Tom claimed that Tammy climbed into a tub of hot water while he was in another room. The treating physician at Basset did not believe that explanation because of Tammy's burn patterns, and instigated a criminal investigation. The Harborview doctors noted that Tammy's burn pattern was consistent with being forcibly restrained for a prolonged period of time in scalding water. Basset and Harborview doctors also noted dozens of marks on Tammy's thighs and indicated that they likely represented prior whipping incidents.

The day after Tammy was burned, the State of Alaska, Department of Health and Social Services, Office of Children's Services (OCS) filed an emergency petition for temporary custody of Tammy and for an adjudication that she was a child in need of aid. The petition referred to a previous domestic violence incident involving Tessa and Tom and the doctors' statements about Tammy's

1. Pseudonyms are used for the family members.

2. Tom was serving in the United States Army and the family was living in military housing on Fort Wainwright, near Fairbanks.

burns and prior scarring. Superior Court Judge Randy M. Olsen granted OCS temporary custody of Tammy.

Tammy returned to Fairbanks in mid–June 2005 with a foster mother and began living with her, but saw Tessa and Tom during supervised one-hour visits twice weekly. In July 2005 Tessa and Tom stipulated that Tammy was a child in need of aid under AS 47.10.011(6) and (8),[3] and Tammy was placed in OCS's custody for one year.

OCS had created a case plan for Tessa while she was in Seattle with Tammy. After her return, Tessa completed initial parenting classes with Fairbanks Counseling and Adoption (FCA) and her visits with Tammy were increased. Tessa obtained substance abuse, behavioral, and psychological evaluations and attended individual counseling sessions. Tessa and Tom also began marriage counseling at FCA in July 2005, but this ended after two sessions due to domestic violence concerns. In August 2005 Tom deployed to Iraq.

Tessa continued individual counseling with FCA until the services ended for lack of funding. FCA counselor Randy Lewis reported (and later testified) that Tessa seemed to believe her circumstances were caused by external forces and she did not need to learn stress reduction, anger management, or conflict resolution techniques, and that she had made little progress toward recognizing her problems. FCA referred Tessa to the Resource Center for Parents and Children (RCPC) family reunification program.

In December 2005 RCPC family service worker Rachael Coady supervised twice-a-week visits between Tessa and Tammy and met separately with Tessa weekly to work on parenting skills. Coady testified at the termination trial that Tessa "failed to recognize that she might be contributing to unhealthy or unsafe parenting methods at home.... [Tessa] stated there was nothing that she needed to work on; that she was a good mother." RCPC discontinued Tessa's services in February 2006 due to her lack of interest in improving specific parenting skills and her lack of motivation for change.

In March 2006 Judge Olsen held a permanency hearing and found that Tessa and Tom had not made substantial progress in remedying the conduct and conditions that harmed Tammy. The permanency plan remained reunification, with a concurrent plan of adoption; OCS explained it would wait for military authorities to decide whether to bring criminal charges before making its own decision about filing a petition to terminate parental rights.

OCS referred Tessa to Carol Brice, an expert in early child development, child abuse and neglect, and bonding and attachment. Tessa worked with Brice for two months. After observing Tessa and Tammy together and working with Tessa in individual sessions, Brice concluded that Tessa and Tammy shared a reciprocal emotional attachment bond. Brice reported that Tessa was receptive to parenting education and committed to raising Tammy in a "safe, healthy, stimulating and nurturing environment that will ensure her potential for success in all arenas[.]" Based on this assessment, OCS modified the visitation schedule in May 2006 to include unsupervised visits to begin Tammy's transition back to Tessa.

In June 2006 OCS filed a petition to extend its custody of Tammy. The petition referred to the transition process then underway to

---

3. **AS 47.10.011 Children in need of aid.** [T]he court may find a child to be a child in need of aid if it finds by a preponderance of the evidence that the child has been subjected to any of the following:

....

(6) the child has suffered substantial physical harm, or there is a substantial risk that the child will suffer substantial physical harm, as a result of conduct by or conditions created by the child's parent, guardian, or custodian or by the failure of the parent, guardian, or custodian to supervise the child adequately; [or]

....

(8) conduct by or conditions created by the parent, guardian, or custodian have

(A) resulted in mental injury to the child; or

(B) placed the child at substantial risk of mental injury as a result of

(i) a pattern of rejecting, terrorizing, ignoring, isolating, or corrupting behavior that would, if continued, result in mental injury; or

(ii) exposure to [certain domestic violence]; or

(iii) repeated exposure to [certain domestic violence.]

expand Tessa's visitation to include overnight visits and a trial six-month home visit. Judge Olsen entered an order extending custody for up to one year, making findings that Tammy's permanency plan was family reunification with a concurrent plan of adoption, but that it was contrary to Tammy's welfare to return her to Tessa at that time.

Tammy showed signs of regression after the unsupervised off-site visits. Her foster mother reported that Tammy was not talking as much, did not want to eat, was becoming less independent, was crying more, and had less motivation. She also reported that after her visits with Tessa, Tammy was withdrawn, would not interact with other children, and often would sleep for long periods.

After an unsupervised visit in July 2006, the foster mother noticed that Tammy's eyes were swollen and she was having trouble focusing. The social worker supervising Tammy's return to the foster mother told her that Tessa had explained it was due to an allergic reaction to cats. The foster mother reported (and later testified) that when she questioned Tammy, Tammy responded that her mother had hit her in her eye. OCS case worker Susan Desrosiers reported (and later testified) that two days later, she also asked Tammy about the incident and that Tammy indicated that her mother had hit her.

In August 2006 OCS initiated counseling for Tammy with therapist Heather Monberg. Tom returned from Iraq in September 2006 but was restricted from visiting Tammy due to a military no-contact order. When Tammy was informed that Tom had returned home, she asked to visit him as long as Monberg was present. The military allowed this conditional visitation, but Monberg became concerned about the stress Tammy experienced while visiting her parents and recommended that visits be reduced in frequency. Tammy then visited with Tessa and Tom once each week for two hours.

In Fall 2006 OCS notified Tessa that it was considering a petition to terminate parental rights based in part on Tessa's refusal to acknowledge that Tammy had been abused or to learn how to address the impact of that abuse on Tammy. In November 2006 Carol Brice conducted a re-assessment of the bond between Tammy and Tessa. Brice reported that Tammy exhibited signs of disrupted attachment relationship with her mother and that their relationship was anxious, disorganized, and insecure. Brice also reported that Tammy's remaining positive emotional attachment with her mother emerged and resulted from the secure attachment relationships she was experiencing in her foster home.

In early January 2007 OCS filed a petition to terminate Tessa and Tom's parental rights. Days later, a military tribunal convicted Tom of maiming Tammy and sentenced him to four years of incarceration.[4]

In March 2007 Tessa began counseling sessions with Dr. Claudia French and started exploring issues about her marriage and her initial response to Tammy's burns. French later testified that Tessa had been very reflective and was in a position to examine things more clearly, but she also testified that Tessa did not mention the scars on Tammy's legs.

Trial was held in May and June 2007.[5] Judge Olsen found clear and convincing evidence that Tessa had not remedied her conduct or home conditions, elaborating that he did not believe Tessa demonstrated an understanding of Tammy's needs or a desire to provide for those needs. He similarly found by clear and convincing evidence that "returning [Tammy to Tessa] would place [Tammy] at a substantial risk of further physical and mental injury." Finally, he found be-

---

4. The record does not reflect when the military's charging decision was made or how that related to OCS's decision to file the petition for termination of parental rights, nor does the record reflect when the military trial actually took place. OCS noted Tom's conviction in amended petition paperwork filed in late January.

5. Tom appeared briefly at trial (telephonically) and waived his continuing presence. Tom agreed that he was in no position to dispute termination of his parental rights, but expressed support for Tessa's efforts to retain her parental rights. Tom's parental rights were terminated at the conclusion of the trial and he is not a party to this appeal.

yond a reasonable doubt that it was in Tammy's best interests for Tessa's parental rights to be terminated.[6] Judge Olsen therefore terminated Tessa's parental rights.

## III. DISCUSSION

### A. Standard of Review

 In a case involving the termination of parental rights, we review a trial court's findings of fact for clear error.[7] Findings are clearly erroneous only if, after reviewing the record in the light most favorable to the prevailing party, we are left with a "definite and firm conviction that a mistake has been made."[8] When reviewing factual findings we ordinarily will not overturn a trial court's finding based on conflicting evidence,[9] and we will not re-weigh evidence when the record provides clear support for the trial court's ruling;[10] "it is the function of the trial court, not of this court, to judge witnesses' credibility and to weigh conflicting evidence."[11] Whether a trial court's findings are consistent with the child in need of aid statutes is a question of law that we review de novo, adopting "the rule of law that is

**6.** Judge Olsen also found that Tammy still was a child in need of aid under AS 47.10.011, and that OCS had made reasonable (but unsuccessful) efforts to provide family support to enable Tammy to return home as required by AS 47.10.088(a)(3) and AS 47.10.086. Judge Olsen thus made all of the findings necessary for the termination of Tessa's parental rights, but only the findings noted above are at issue in this appeal.

**7.** *Martin N. v. State, Dep't of Health & Soc. Servs.*, 79 P.3d 50, 53 (Alaska 2003).

**8.** *Brynna B. v. State, Dep't of Health & Soc. Servs.*, 88 P.3d 527, 529 (Alaska 2004) (quoting *A.B. v. State, Dep't of Health & Soc. Servs.*, 7 P.3d 946, 950 (Alaska 2000)).

**9.** *Martin N.*, 79 P.3d at 53 (citing *In re Friedman*, 23 P.3d 620, 625 (Alaska 2001)).

**10.** *D.M. v. State, Div. of Family & Youth Servs.*, 995 P.2d 205, 214 (Alaska 2000).

**11.** *In re Adoption of A.F.M.*, 15 P.3d 258, 262 (Alaska 2001) (citing *Knutson v. Knutson*, 973 P.2d 596, 599–600 (Alaska 1999)).

**12.** *E.g., Brynna B.*, 88 P.3d at 529.

**13.** **AS 47.10.088. Involuntary termination of parental rights and responsibilities.** (a) Except as provided in AS 47.10.080(*o*), the rights and

most persuasive in light of precedent, reason, and policy."[12]

### B. Tessa Failed To Remedy Her Conduct Within a Reasonable Time and Returning Tammy to Tessa Would Place Her at Substantial Risk of Harm.

 Under AS 47.10.088(a)(2),[13] the termination of parental rights requires a finding by clear and convincing evidence that either the parent has not remedied harmful conduct or conditions or the parent has failed to make enough progress within a reasonable time so that there still is a substantial risk of harm to the child if returned to the parent. Here, Judge Olsen found by clear and convincing evidence that Tessa had not remedied her conduct and that regardless of any progress, there still was a substantial risk of harm to Tammy if she were returned to Tessa.

Tessa argues that this court should take a more objective view of her actions rather than utilize the subjective and arbitrary standards applied by OCS and, presumably, the trial court.[14] For example, Tessa points out

responsibilities of the parent regarding the child may be terminated for purposes of freeing a child for adoption or other permanent placement if the court finds by clear and convincing evidence that

. . . .

(2) the parent

(A) has not remedied the conduct or conditions in the home that place the child at substantial risk of harm; or

(B) has failed, within a reasonable time, to remedy the conduct or conditions in the home that place the child in substantial risk so that returning the child to the parent would place the child at substantial risk of physical or mental injury; and

(3) the Department has complied with the provisions of AS 47.10.086 concerning reasonable efforts.

**14.** Tessa relies on *E.J.S. v. State, Department of Health & Social Services*, 754 P.2d 749, 750 (Alaska 1988), which describes an objective test to determine whether or not a child has been physically abandoned by a parent. In the abandonment context, courts look at parental conduct rather than "wishful thoughts and hopes" because the parent's subjective intent ignores the reality of the child's existence in a foster home while the absent parent retains parental rights. *D.M. v. State*, 515 P.2d 1234, 1236–37 (Alaska 1973). The determination before us here, by its

that she engaged in parenting education and also agreed to pay for some of Carol Brice's services, which is above and beyond what is normally expected from OCS clients. She also notes that she consistently attended visitation with Tammy. To contrast her stated objective conduct to what she views as OCS's inappropriate subjective standards for evaluating her parenting ability, Tessa gives specific examples of trial testimony: Carol Brice's disapproval of Tessa using sessions to braid Tammy's hair; Carmen Brooks' (OCS) criticism of Tessa's insistence that Tammy speak with her relatives on the phone; Beth Gambrell's (FCA) comment that Tessa did not offer Tammy a drink when Tammy was thirsty; and Rachael Coady's (RCPC) testimony that Tessa was "bribing" Tammy with treats from McDonald's at the end of scheduled visits.

We agree with Tessa that these criticisms are not determinative of her parenting ability, but we conclude that they were unnecessary to OCS's case. We also conclude that, despite the "objective evidence" supporting Tessa's arguments, when all of the evidence is viewed in the light most favorable to OCS there is ample support for Judge Olsen's findings that Tessa failed to remedy her conduct and that Tammy would be at substantial risk of harm if she were returned to Tessa.[15]

Carol Brice testified that Tessa failed to comprehend Tammy's needs. Brice first had a positive outlook for Tammy and Tessa's relationship, but her hope for reunification deteriorated as Tessa failed to develop an understanding of Tammy's needs and to change her behavior to meet them. Brice stated, "Most of the time [Tessa] could not allow herself to understand or comprehend or meet her child's needs at the level the child was expressing the needs." Brice testified that there was "[n]o empathy, no concern about the extent of these injuries, how it happened, how it affected [Tammy]." Counselors from both FCA and RCPC testified that Tessa failed to recognize that she needed to work on her parenting skills. Moreover, Tessa conceded at trial that she had not always focused on Tammy's needs and had not realized that her approach to situations with Tammy was a problem. The trial testimony as a whole shows that Tessa failed to make the changes required to meet Tammy's needs, which supports the findings that Tessa failed to remedy her conduct and that Tammy still was at substantial risk of harm.

Judge Olsen found that even prior to the burn injury Tammy had been systematically abused.[16] Susan Desrosiers testified that in

---

very nature, requires not just an evaluation of objective conduct, but also broader and more subjective considerations and judgments. We particularly note AS 47.10.088(b), which provides that in determining whether a parent has remedied conduct, the trial court may consider any fact relating to the best interests of the child, including:

(1) the likelihood of returning the child to the parent within a reasonable time based on the child's age or needs;
(2) the amount of effort by the parent to remedy the conduct or the conditions in the home;
(3) the harm caused to the child;
(4) the likelihood that the harmful conduct will continue; and
(5) the history of conduct by or conditions created by the parent.

15. Tessa also suggests that OCS and the various service providers were biased against her, and therefore did not recognize her actual progress, because of their suspicions that she was involved in Tammy's burning. This seems a valid basis for vigorous cross-examination during trial and artful persuasion during closing argument, but lends little to Tessa's appeal in light of the applicable standard of review. Moreover, Judge Ol-

sen expressly noted that "OCS initially presumed that the father was the problem and attempted to restore the child to her mother." If this were not the case, it is unlikely that OCS would have made such impressive attempts to assist Tessa with reunification efforts. As Judge Olsen noted, "[OCS] devoted a huge amount of resources to this family and provide[d] many opportunities to the parents to provide for return of [Tammy] to her family. Lots of services were offered including multiple parenting programs, individual and marital counseling, visits, various assessments for substance abuse and anger management. A great deal of effort was made to assist the parents in remedying their behavior but it was not successful." As we noted earlier, Tessa does not appeal Judge Olsen's finding (by clear and convincing evidence) that OCS made reasonable efforts to assist the family. *See supra* note 6.

16. Specifically, in his July 17, 2007, findings and order, Judge Olsen stated:

The court finds there was systematic, on going, emotional and physical abuse.... With regard to the non-burn injuries to [Tammy] it appears, from the photos admitted into evidence, that someone struck [Tammy] with [a] coat hanger

order to make progress after the burns Tammy suffered, "the parents would have to acknowledge what happened to their child." Desrosiers stated that Tessa did not really begin to make this acknowledgment until December 2006, and then more fully in April 2007. This was two years after OCS created a case plan for Tessa, and just before trial. Even this belated acknowledgment of abuse was not complete—Tessa failed to acknowledge Tammy's scars during her counseling sessions with Dr. French, Tessa testified at trial that she did not remember how Tammy obtained the unusual scarring on her thighs,[17] and at trial Tessa continued to deny hitting Tammy in July 2006.[18]

Judge Olsen stressed that Tammy was "incredibly emotionally damaged" and endured "emotional and physical abuse" and that Tessa either did not protect Tammy or contributed to Tammy's harm, or both. To remedy her conduct and demonstrate that Tammy would not be at substantial risk of harm if returned to her, Tessa would have had to end the abuse, address Tammy's severe emotional damage caused by the prior abuse, come to an understanding of Tammy's needs, and develop a desire and an ability to respond to those needs. Judge Olsen found by clear

and convincing evidence that Tessa failed to do so. That finding is adequately supported by the record.

## C. Termination of Tessa's Parental Rights Was in Tammy's Best Interests.

When terminating parental rights, a court "shall consider the best interests of the child."[19] "[T]he best interests of the child, not those of the parents, are paramount."[20] The court may order termination only if OCS proves "by a preponderance of the evidence that termination of parental rights is in the best interests of the child."[21] Judge Olsen found "not merely by a preponderance of the evidence, but ... beyond a reasonable doubt" that it was in Tammy's best interests to terminate Tessa's parental rights.

Tessa argues that she has a vital bond and attachment with Tammy that continued despite the disruption of foster care. Tessa further argues that the differences in Tammy's behavior while in her foster mother's care, compared to Tessa's care, cannot be attributed to failures on Tessa's part and should not be seen as a demonstration that

and left scars on her thighs. The jackstraw scars also found on her thighs were due to repeated instances of being struck by a thin object such as a ruler, cord, or belt. [Tessa] acknowledged that [Tammy] had scar[r]ing on her face near her eye. While the mother blamed the father for these various whipping scars to [Tammy], the court notes at the time of the burn injuries and observations of the whipping scars, [Tom] had only recently returned to the home, having been out of the home for two months shortly before the date [Tammy] was burned. [Tessa] acknowledged having arguments with [Tom] regarding his use of corporal punishment of [Tammy]. This testimony verifies to the court that the scar[r]ing was noticeable and the father was abusive. The court finds that the injuries which le[]d to the whipping scars occurred either before the father left for training in January 2005 or were committed in his absence by the mother.

17. Despite this memory lapse, Tessa concedes on appeal that "Tammy was subjected to inappropriate discipline amounting to physical abuse" and that "she had inappropriately struck Tammy with a belt on rare occasions." Tessa claimed she had learned new and appropriate forms of discipline, but Judge Olsen found that Tessa was

not credible about her lack of knowledge of the extent of the harm Tammy suffered before the burns and thus her other testimony was suspect: "The court clearly, and unequivocally, finds portions of the mother's testimony unbelievable, at times not truthful, and frequently hedging. Because of this finding the court considers [Tessa's] testimony with suspicion." We defer to Judge Olsen on this credibility determination.

18. Tessa argues that OCS did not produce sufficient evidence to prove that she hit Tammy in July 2006. Two different people testified that Tammy communicated to them that Tessa had hit her, while Tessa testified that she did not hit Tammy. As we already have noted, Judge Olsen found that Tessa was not a credible witness and we defer to his credibility determination. *See supra* note 17. Judge Olsen's finding that Tessa hit Tammy in July 2006 is not clearly erroneous and will not be set aside.

19. AS 47.10.088(c).

20. *A.A. v. State, Dep't of Family & Youth Servs.,* 982 P.2d 256, 260 (Alaska 1999).

21. CINA Rule 18(c)(3).

Tammy's best interests are served by being in a foster home rather than with her mother. Tessa thus argues that the trial court's finding is clearly erroneous. The evidence presented at trial belies this argument; when viewed in the light most favorable to OCS, it adequately supports the court's finding.

Tammy's therapist, Heather Monberg, testified that Tammy's lack of emotional connectedness with Tessa "seems to be reflected in [Tammy's] behavior." Monberg testified that Tammy appears to feel safe with her foster mother and that she is the person with whom Tammy has the most potential. Finally, Monberg stated her opinion that it was not in Tammy's best interests to return to Tessa's household because it was not an environment in which Tammy could thrive.

Carol Brice described Tessa's bond with Tammy as based on possession. It was Brice's opinion that she had "not seen the changes that we need to see ... to assure us that this child would grow up in a stress-free, a violence[-]free ... environment." Brice also said that Tammy "never fully engaged in what I would hope to see as a happy, rejoicing reunion with her mother."

OCS's Susan Desrosiers testified that if Tammy were returned to her mother she would not develop in a healthy way because of stress and anxiety and would be at risk for additional physical and emotional abuse, and that Tammy "needs to be in a safe, nurturing, loving environment and [Tessa] hasn't demonstrated that she can provide that for her child." Tammy's pre-school teacher testified that Tammy continued to experience very significant developmental delays in speech and communication, and that she refused to engage in gross motor activities despite the fact that she had the physical ability to move around like a typical child.

Given this testimony Judge Olsen easily could find by at least the necessary preponderance of the evidence, if not beyond a reasonable doubt, that the termination of Tessa's parental rights was in Tammy's best interests.

## IV. CONCLUSION

The record contains sufficient evidence to support Judge Olsen's findings that Tessa failed to remedy the conduct that placed Tammy at risk, that returning Tammy to Tessa would place Tammy at substantial risk of harm, and that it was in Tammy's best interests to terminate Tessa's parental rights. We therefore AFFIRM the order terminating Tessa's parental rights.