*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| OFFICE OF PUBLIC ADVOCACY, | ) |
| | ) Supreme Court No. S-17330 |
| Petitioner, | ) |
| | ) Superior Court No. 3PA-18-00204 CN |
| v. | ) |
| | ) O P I N I O N |
| SUPERIOR COURT, THIRD JUDICIAL | ) |
| DISTRICT, | ) No. 7448 – May 1, 2020 |
| | ) |
| Respondent. | ) |
| | ) |

Petition for Review from the Superior Court of the State of Alaska, Third Judicial District, Palmer, Kari Kristiansen, Judge.

Appearances: Olena Kalytiak Davis, Anchorage, for Petitioner. Dunnington Babb, Cashion Gilmore LLC, Anchorage, for Respondent. Renee McFarland, Assistant Public Defender, and Beth Goldstein, Acting Public Defender, Anchorage, for Public Defender Agency. Maria Bahr, Assistant Attorney General, Anchorage, and Kevin G. Clarkson, Attorney General, Juneau, for Office of Children's Services.

Before: Bolger, Chief Justice, Winfree, Stowers, Maassen, and Carney, Justices.

WINFREE, Justice.

# I.  INTRODUCTION

The primary issue in this child in need of aid (CINA) proceeding is whether a putative father's parentage may be judicially established by "sufficient evidence" presented to the superior court — or must be established by scientific, genetic testing — to allow appointment of public agency counsel to the putative father in a CINA proceeding.  We conclude that a judicial determination of paternity does not necessarily need underlying scientific, genetic testing in this context, and we affirm the superior court's decision.

# II.  FACTS AND PROCEEDINGS

## A.  Emergency Custody

In early December 2018 Jan K. gave birth to Ada K. in Anchorage.[1]  Within a few days the Office of Children's Services (OCS) took emergency custody of Ada[2] and filed an emergency petition to adjudicate her as a child in need of aid.[3]  OCS's petition identified Ralph W. as Ada's father.  OCS indicated Jan had reported that Ralph was the "biological father" and that he "had intended to be at the hospital for the birth."

OCS asserted in its petition that Jan and Ralph did not reside together, but that both lived in Wasilla.  OCS indicated that Ralph had "presented at the office and wanted a paternity test done."  According to OCS, Ralph said he had known Jan for "approximately one year"; Ralph "was aware of the pregnancy and was certain that he was the father and wanted the child to be placed with him."  OCS also asserted that

---

[1]  Pseudonyms are used to protect the parties' privacy.

[2]  *See* AS 47.10.142 (authorizing OCS to take emergency custody of child).

[3]  *See* AS 47.10.142(c) ("If the department determines that continued custody is necessary to protect the child, the department shall notify the court of the emergency custody by filing, within 24 hours after custody was assumed, a petition alleging that the child is a child in need of aid.").

Ralph said he had been present at all of Jan's prenatal appointments and they planned to marry. According to OCS, Ralph explained he had not been present at the birth because Jan had been unable to call him, and no one else had called him. OCS noted that Ralph took a paternity test that day.

### B. CINA Proceedings

The superior court held an emergency temporary custody hearing concerning Ada the next day.[4] Jan and Ralph were present and identified themselves as Ada's mother and father. When asked whether they wanted lawyers, Jan and Ralph answered affirmatively; OCS then argued that Ralph was a "putative father" and that the court could not appoint a lawyer for him until his paternity was established through the previous day's paternity test, although the results were not expected for approximately two weeks.

To obtain "testimony about the appointment of counsel," the court placed Jan and Ralph under oath and inquired about their financial circumstances and relationships to Ada. After confirming that the Public Defender Agency represented Jan in other proceedings and that her financial situation had not substantially improved, the court appointed the Agency to represent Jan. The court determined Ralph also was financially eligible and asked more questions regarding paternity:

> The Court: Are you on the birth certificate?
>
> Jan: We didn't get to fill out the paperwork —
>
> Ralph: Yeah. I didn't —
>
> Jan: — before [Ada] was removed. I'm not even on the birth certificate, as far as I know.

---

[4] *See* AS 47.10.142(d) (requiring court to hold temporary custody hearing within 48 hours of when court is notified of emergency custody of child alleged to be in need of aid).

The Court: Okay.

Ralph: Yeah. I wasn't able to make it into Anchorage.

The Court: All right. And [Jan], I'm sorry I don't know the answer to this question. Are you married to anybody else currently?

Jan: No.

The Court: Okay. So you're not married. And do you believe [Ralph] is the father?

Jan: Oh, yes.

Ralph: Oh, yeah.

The Court: And [Ralph], you believe you're —

Ralph: Yeah, there's no doubt.

The Court: — the father? I understand a paternity test has been taken, but there's nobody else who would — who is claiming to be the father and there's no one else who would be the legal father of this child, so I'm going to appoint the father a public defender at this point.

The public defender in court indicated that the Office of Public Advocacy (OPA) would have to substitute as counsel for Ralph because of the Agency's conflict in representing Jan and that it was unclear how OPA would respond.

That same day the court ordered appointment of counsel for Ralph in the CINA proceedings. When the parties next returned to court, Jan's public defender informed the court that OPA had refused to stipulate to a substitution of counsel. The public defender indicated that OPA believed the previous testimony was insufficient to establish Ralph's paternity.

The initial superior court judge was preempted and a second superior court judge then held a hearing to "clarify [Ralph's] appointment." After learning that Jan and

Ralph had testified under oath to their belief that Ralph was the father, the court issued an order directly appointing OPA to represent Ralph. The court stated:

> And [OPA] can file a motion with the court, but my position in these cases has always been that I'm not going to wait for a DNA test to tell the court . . . whether somebody is verifiably a father or not if the parents are willing to affirmatively state so under oath. I don't think that parents should have to wait to get counsel appointed to represent them, and I don't –
>
> . . . .
>
> – think it's the court system's duty to do that either.

Jan's public defender agreed that doing so "better preserve[d] [the] father's constitutional rights" and validated Ralph's concerns about the first few weeks with a child being "very important." Ralph asked the court about the soonest date Ada could be placed with him. OCS indicated that it was still waiting for the paternity test results and "looking into [Ralph's] background."

At a mid-December hearing OPA's deputy director appeared in an administrative capacity and stated OPA's position that, despite the previous paternity testimony, without paternity test results appointment of counsel is "not authorized" for a "putative father." OPA's deputy director explained that the court could appoint Administrative Rule 12(e)[5] counsel for Ralph and that OPA could take the case once positive paternity test results were received. The court responded:

> [I]f parents have, under oath, both testified that they believe that the father, although he's not actually been DNA-tested, the results are not in, and they're not married, that based on that testimony, that that's . . . sufficient evidence to show that

---

[5]     *See* Alaska Admin. R. 12(e)(1), (5) (providing for constitutionally required appointment of counsel at court system expense when appointment of Public Defender Agency or OPA is not authorized).

in this case [Ralph] is the father based on the record that's before the court.

And I know that you disagree with this, and the court should have [Rule] 12(e) counsel, but I disagree with your view. And so that's why OPA has been directly appointed because I know they won't take the appointment from the [Public Defender Agency]. So –

. . . .

– OPA will have to get him an attorney.

Ralph reiterated that he wanted Ada placed with him "as quick as possible," and Jan's public defender stated that Jan also wanted "to see placement for now with [Ralph]." But like OPA, OCS indicated that it deemed Ralph a putative father; OCS would not place Ada with him without paternity test results. Ralph reiterated, "Oh, I know I'm the father. There's no — there's no doubt in my mind or her mind that I am the father." The court explained that placement would need to be addressed at a hearing when Ralph had legal representation. The court reiterated the paternity evidence was "sufficient" and distinguished between OCS and the court: "While [OCS] may have a position that says, look, we don't place children with parents that have not been established through a DNA test . . . it doesn't mean that the court can't take a different position . . . ."

OPA's deputy director and Jan's public defender requested a 30-day continuance for the probable cause hearing,[6] but the court refused. The court noted that CINA probable cause hearings are supposed to be "expeditiously" addressed and that the CINA Rules do not authorize such a lengthy delay. A hearing was set for early January.

---

[6] *See* AS 47.10.142(e) (requiring court to "determine whether probable cause exists for believing the child to be a child in need of aid, as defined in AS 47.10.990").

Ralph was represented by an OPA attorney at the January hearing.  No paternity test results had been received.  The parties nonetheless stipulated, subject to the pending paternity test results, that Ada be placed with Ralph and that "if it turns out that [Ralph] is not the father, [OCS] will have the authority to immediately remove [Ada]."

OPA petitioned for our discretionary review of the court's appointment order.  Within a week the paternity test results had excluded Ralph as Ada's father, and an order disestablishing paternity subsequently was entered.  Despite the issue being moot, we granted OPA's petition for review to clarify the appointment of counsel in this context.[7]

## III.   STANDARD OF REVIEW

"We apply our independent judgment when interpreting the statutes governing appointment of counsel and our administrative and procedural rules."[8]  When engaging in statutory interpretation, we adopt "the rule of law that is most persuasive in light of precedent, reason, and policy."[9]

---

[7]     *See Office of Pub. Advocacy v. Superior Court, Second Judicial Dist.*, 3 P.3d 932, 933 (Alaska 2000) ("We granted discretionary review in this case to clarify who is entitled to appointed counsel in such cases, and because the issue might otherwise evade review.").

[8]     *Id*.

[9]     *Jude M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 394 P.3d 543, 550 (Alaska 2017) (quoting *Tessa M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 182 P.3d 1110, 1114 (Alaska 2008)); *see also Sabrina V. v. Dep't of Health & Soc. Servs., Office of Children's Servs.*, 442 P.3d 717, 721 (Alaska 2019) ("When interpreting CINA statutes and rules, we apply our independent judgment, 'adopting the rule of law that is most persuasive in light of precedent, reason, and policy.' " (quoting *Danielle A. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 215 P.3d 349, 353 (Alaska 2009))).

## IV. DISCUSSION

### A. Agency Enabling Statutes And Court Rules

In CINA proceedings indigent parents are appointed counsel pursuant to CINA Rule 12(b),[10] following the process set out in Administrative Rule 12.[11] Under Rule 12(a) the court must "specifically" determine that the appointment is "clearly authorized by law or rule" and that a person is indigent. Appointments are governed by three sources: the Agency's enabling statute,[12] OPA's enabling statute,[13] and, when a constitutionally required appointment is not authorized under either enabling statute, Rule 12(e).[14]

We have recognized that the enabling statutes authorize the agencies to "represent indigent persons entitled to representation in CINA proceedings."[15] Alaska Statute 18.85.100(a) allows the court to appoint the Agency for an "indigent person" who

---

[10]    CINA Rule 12(b) provides that the "court shall appoint counsel pursuant to Administrative Rule 12."

[11]    Alaska Administrative Rule 12(a) provides that the "court shall appoint counsel . . . only when the court specifically determines that the appointment is clearly authorized by law or rule, and that the person for whom the appointment is made is financially eligible for an appointment at public expense."

[12]    AS 18.85.100 (defining Public Defender Agency's authority to provide counsel to indigent litigants); *see also* Alaska Admin. R. 12(b) (outlining appointment procedure for Public Defender Agency).

[13]    AS 44.21.410 (defining OPA's powers and duties); *see also* Alaska Admin. R. 12(c) (outlining appointment procedure for OPA).

[14]    Alaska Admin. R. 12(e)(1), (5) (outlining appointment procedure for Alaska Bar Association members at court system expense, referred to as 12(e) counsel).

[15]    *Office of Pub. Advocacy v. Superior Court, Second Judicial Dist.*, 3 P.3d 932, 934 (Alaska 2000).

is "entitled to representation under the Supreme Court Delinquency or [CINA] Rules." And under AS 44.21.410(a)(5), OPA shall "provide legal representation . . . in cases involving indigent persons who are entitled to representation under AS 18.85.100 and who cannot be represented by the . . . [A]gency because of a conflict of interests." The foremost question then is whether a person is entitled to representation under AS 18.85.100; in the CINA context this generally depends on whether that person is "entitled to representation under" the CINA Rules.[16]

CINA Rule 12(b)(1) provides that a "court shall appoint counsel . . . for a parent or guardian who is financially unable to employ counsel." OPA's argument focuses on the scope of Rule 2(k)'s definition of "parent" as a "biological or adoptive parent whose parental rights have not been terminated." OPA argues for a strict construction of "biological" parent. OPA concludes that, when there is an unresolved paternity test, any paternity determination is legally insufficient in light of the CINA Rules' definition of a parent. We thus examine whether public agency representation of a putative father is clearly authorized in a CINA proceeding when the court, without genetic evidence, determines the putative father to be a parent.

## B.    Statutory Interpretation

In statutory interpretation "we consider three factors: 'the language of the statute, the legislative history, and the legislative purpose behind the statute.' "[17] We use

---

[16]    AS 18.85.100(a); AS 44.21.410(a)(5).

[17]    *Alaska Ass'n of Naturopathic Physicians v. State, Dep't of Commerce*, 414 P.3d 630, 634 (Alaska 2018) (quoting *Oels v. Anchorage Police Dep't Emps. Ass'n*, 279 P.3d 589, 595 (Alaska 2012)).

a sliding scale: "the plainer the statutory language is, the more convincing the evidence of contrary legislative purpose or intent must be."[18]

### 1. Plain meaning

The CINA statutes and the CINA Rules similarly define "parent" to include a biological parent,[19] but neither defines the term "biological parent." OPA's suggested interpretation requires *scientific proof* of a genetic relationship. But the CINA Rules prescribe no "specific procedure" for paternity determinations, indicating that the Rules do not override other relevant statutes relating to paternity.[20] And OPA cites nothing establishing a categorical rule requiring scientific evidence to establish paternity.

Alaska law provides a number of ways to establish a parent-child relationship. Alaska's legitimation statute, AS 25.20.050, provides for paternity establishment without scientific evidence — by subsequent marriage, written acknowledgment of paternity, or a superior court's paternity determination upon "sufficient evidence."[21] The legitimation statute allows a court to weigh the results of a

---

[18] *Alaska Tr., LLC v. Bachmeier*, 332 P.3d 1, 7 (Alaska 2014) (quoting *W. Star Trucks, Inc. v. Big Iron Equip. Serv., Inc.*, 101 P.3d 1047, 1050 (Alaska 2004)).

[19] AS 47.10.990(26) (defining "parent" as "the biological or adoptive parent of the child"); CINA Rule 2(k) (defining "parent" as "a biological or adoptive parent whose parental rights have not been terminated").

[20] *See* CINA Rule 1(g) ("Where no specific procedure is prescribed by these rules, the court may proceed in any lawful manner . . . . Such a procedure may not be inconsistent with these rules and may not unduly delay or otherwise interfere with the unique character and purpose of [CINA] proceedings.").

[21] Paternity may be established when "the putative parent subsequently marries the undisputed parent of the child; . . . the putative father and the mother both sign a form for acknowledging paternity under AS 18.50.165; or . . . the putative parent is determined by a superior court without jury or by another tribunal, upon sufficient

(continued...)

genetic test against other evidence, but even statistically high genetic test results establish only a rebuttable presumption of paternity.[22] Under the statute the court has discretion to adjudicate parentage without ordering genetic testing;[23] this discretion is especially valuable because testing delays or non-compliant putative parents may disrupt a CINA proceeding's expeditious nature.[24]

We further note that the legislative definition of "biological parent" under AS 18.50.950 of the Vital Statistics Act is a "parent named on the original certificate of birth of an adopted person."[25] Although in a different context, this statute was enacted close in time to the CINA Rules and addresses related subject matter:[26] the legislature

---

[21]    (...continued)
evidence, to be a parent of the child."  AS 25.20.050(a).

[22]    AS 25.20.050(d); *see Smith v. Smith*, 845 P.2d 1090, 1092 (Alaska 1993); *see also In re Estate of Seward*, 424 P.3d 333, 337 (Alaska 2018) ("[A] 95% probability only creates a presumption of parentage that may be rebutted by clear and convincing evidence.").

[23]    The legitimation statute requires the tribunal to order genetic testing when "paternity is contested," upon the request of the child support services agency, or a party with a sworn statement.  AS 25.20.050(e)(1)-(2).  But, even under these narrow circumstances, testing is not required if the court "finds that good cause exists not to order genetic testing after considering the best interests of the child."  AS 25.20.050(i).

[24]    *See Rubright v. Arnold*, 973 P.2d 580, 583-85 (Alaska 1999) (affirming parentage determination on merits and as sanction in paternity action after putative father refused to comply with genetic testing).

[25]    AS 18.50.950(2).

[26]    *See* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW:  THE INTERPRETATION OF LEGAL TEXTS 172-73 (2012) ("[T]he presumption of consistent usage can hardly be said to apply across the whole *corpus juris*. . . . But the more connection the cited statute has with the statute under consideration, the more plausible

(continued...)

added definitions of "biological parent" and "adoptive parent" in 1986,[27] not long before the CINA Rule defining "parent" as a "biological or adoptive parent" was adopted in 1987.[28] Alaska Statute 18.50.950 provides the controlling definitions for vital statistics[29] statutes relating to parentage determinations — including acknowledgments of paternity,[30] marriage registration,[31] and birth registration.[32] The birth registration statute, AS 18.50.160, allows listing a father on a birth certificate without scientific evidence of a genetic relationship.[33] This statutory definition, relying directly on the name listed on

---

[26] (...continued) the argument becomes. If it was enacted at the same time, and dealt with the same subject, the argument could even be persuasive.").

[27] *See* ch. 140, § 3, SLA 1986 (current version at AS 18.50.950).

[28] *See* Alaska Supreme Court Order No. 845 (July 16, 1987).

[29] Vital statistics "means records of birth, death, fetal death, induced termination of pregnancy, marriage, divorce, adoption, and related data." AS 18.50.950(18).

[30] AS 18.50.165.

[31] AS 18.50.270.

[32] AS 18.50.160.

[33] The statute outlines two processes for entering a father's name on the birth certificate, depending on the mother's marital status. If the mother was *married* at conception, during the pregnancy, or at birth, her husband is entered on the birth certificate as the father in most circumstances. If the mother was *unmarried*, a father may be entered on the birth certificate if a tribunal has lawfully determined his paternity or if both he and the mother execute affidavits acknowledging his paternity. AS 18.50.160(d)-(e); *see also Ray v. Ray*, 115 P.3d 573, 576 (Alaska 2005) (interpreting AS 18.50.160(d) as establishing marital presumption that husband is father of child born to wife during marriage, absent clear and convincing evidence to contrary).

the birth certificate, thus indicates that the term "biological parent" does not categorically require scientific evidence.[34]

Our construction of paternity under the Indian Child Welfare Act (ICWA)[35] also demonstrates that scientific proof of a genetic relationship is not required.[36] Because ICWA provides no standard for establishing paternity, courts resolve the issue under state law.[37] We see no reason to construe the similar use of the term "biological parent" in the CINA Rules differently as rigidly requiring scientific proof when a court establishes paternity in a non-ICWA proceeding.

### 2. Rule history and purpose

OPA presents no convincing statutory or rule history or intent definitively requiring scientific evidence of a genetic relationship to be a parent. And it is contrary to the expeditious nature of CINA proceedings to read CINA Rule 2(k)'s definition as establishing a specific procedure requiring scientific evidence before appointment of counsel.[38] Allowing a court to timely resolve paternity "upon sufficient evidence" best

---

[34]     *See* AS 18.50.950(2).

[35]     25 U.S.C. § 1903(9) (2018) (" '[P]arent' means any biological parent or parents of an Indian child or any Indian person who has lawfully adopted an Indian child, including adoptions under tribal law or custom. It does not include the unwed father where paternity has not been acknowledged or established.").

[36]     *See Bruce L. v. W.E.*, 247 P.3d 966, 979 (Alaska 2011) (determining that putative father who requested genetic testing to no avail, but otherwise made reasonable efforts to acknowledge paternity, qualified as parent under ICWA).

[37]     *In re Daniel M.*, 1 Cal. Rptr. 3d 897, 900 (Cal. App. 2003) (citing *In re Adoption of a Child of Indian Heritage*, 543 A.2d 925, 935 (N.J. 1988); *Yavapai-Apache Tribe v. Mejia*, 906 S.W.2d 152, 171-73 (Tex. App. 1995)).

[38]     *See* CINA Rule 1(c) ("These rules will be construed and applied to promote
(continued...)

comports with the CINA Rules' construction.[39] According to the National Council of Juvenile and Family Court Judges guidelines, "[t]imely resolution of paternity issues is both in the best interests of the child and essential to avoiding delays at subsequent points in the court process."[40]

We also are informed by the Agency's and OCS's practices demonstrating that scientific evidence is not definitively required. The Agency indicates in its briefing to us that when considering its authorization to accept an appointment to represent a parent in a CINA proceeding, it does not require the court to scientifically confirm the biological relationship. OCS's practice also is instructive because OCS must determine the identity of a child's parent when assuming custody of a child.[41] OCS looks to the "child's birth certificate to ascertain the child's paternity," and "will verify that paternity is not in question by asking both the mother and the father who is listed on the birth

---

[38] (...continued)
fairness, accurate fact-finding, the expeditious determination of children's matters, and the best interests of the child.").

[39] *See id.*; *see also* AS 25.20.050(a)(4) (allowing superior court to adjudicate putative parent as parent "upon sufficient evidence").

[40] SOPHIE I. GATOWSKI, ET AL., NAT'L COUNCIL OF JUV. & FAM. COURT JUDGES, ENHANCED RESOURCE GUIDELINES: IMPROVING COURT PRACTICE IN CHILD ABUSE AND NEGLECT CASES 82 (2016); *see also* ALASKA OFFICE OF CHILDREN'S SERVICES, CHILD PROTECTIVE SERVICES MANUAL § 2.5.1 (rev. Nov. 15, 2013) [hereinafter CPS MANUAL] ("Timely identification of parents is critical for child's permanence and well-being.").

[41] *See* AS 47.10.020(b)(4) (stating that petition for adjudication of child as in need of aid must include "the names and addresses of the child's parents"); *see also* CPS MANUAL § 2.5.2 at Background Information B(1) ("When a petition for a finding that a child is a child in need of aid is filed, the child's parent(s) must be notified of the proceedings.").

certificate if he is the father."[42] OCS considers paternity to be in question if the mother alleges "someone other than the person named on the birth certificate is the father, someone other than the individual named claims paternity," the individual denies paternity, "no father is named on the birth certificate or in CSSD records," or "paternity was established through a default order."[43] OCS also allows a three-party "affidavit of paternity" as an alternative to the birth certificate when a mother who was married at the time of the child's birth names a man other than her husband as the putative father.[44]

### 3. Conclusion

We do not interpret CINA Rule 2(k)'s definition of "parent" to categorically require scientific, genetic evidence to establish parentage. The term's plain meaning, the rule's history, the construction of the CINA Rules, and agency practice support no rigid rule requiring scientific proof to establish parentage in CINA proceedings. Without any predicate foundation, we cannot forge such a rule at the risk of contravening the expeditious nature of CINA proceedings. Alaska's legitimation statute directly addresses acceptable evidence and the circumstances when genetic testing is required for a court to adjudicate parentage.[45]

In light of precedent, reason, and policy, we hold that CINA Rule 2(k)'s definition of "parent" includes a person determined by the superior court to be a parent, even absent scientific evidence, so long as there otherwise is sufficient evidence. If, in a CINA proceeding, a court adjudicates an indigent putative parent as a parent upon sufficient evidence, even absent scientific evidence, the court may appoint public agency

---

[42]    CPS MANUAL, § 2.5.1 at Procedure A(1)-(2).

[43]    *Id.* at Procedure A(3)(a)-(e).

[44]    *Id.* at Procedure A(5).

[45]    *See* AS 25.20.050.

counsel pursuant to Administrative Rule 12, the enabling statutes, and the CINA Rules. If later genetic evidence leads to disestablishment of an individual as the biological parent, the appointed agency shall then move to withdraw under Administrative Rule 12.[46]

## C.     This Court Appointment

We next address the superior court's paternity determination and subsequent appointment order for OPA in this case. OPA does not challenge the court's finding that Ralph was indigent. Determining whether the court erred by appointing public counsel thus depends on whether it erred in its paternity determination.

OPA first argues that because the superior court allowed paternity testing to proceed, the court did not actually make a determination that Ralph was the father. But the record clearly shows that the court did make a paternity determination.

OPA next challenges the sufficiency of evidence for the court's determination under Alaska's legitimation statute, AS 25.20.050. When the court made its paternity determination, the evidence before it included Jan's and Ralph's sworn testimony that Ralph was Ada's father. But OPA characterizes both Jan's and Ralph's testimony as "weak threaded" and maintains that the court failed to probe for further clarification. Contrary to OPA's contention, the court did make factual probes regarding Ada's birth certificate, Jan's marital status, and Jan's and Ralph's certainty regarding paternity. At the first hearing the court heard that Jan was not married, the birth certificate named no father (and possibly no mother), and that both Jan and Ralph were certain Ralph was the father. The court noted no other person was claiming to be Ada's father or could claim to be her father by virtue of marriage. At one subsequent hearing

---

[46]     Alaska Admin. R. 12(d); *see Office of Pub. Advocacy v. Superior Court, Second Judicial Dist.*, 3 P.3d 932, 935 (Alaska 2000) ("Rule 12(d) imposes an obligation on the agency, not the court.").

the testimony from the first hearing was referenced, Ralph again expressed certainty about his paternity, and the court stated there was "sufficient" evidence to establish paternity. We agree the evidence was legally sufficient.[47]

## V. CONCLUSION

We AFFIRM the superior court's decision.

---

[47] AS 25.20.050(a)(4) ("Acceptable evidence includes evidence that the putative parent's conduct and bearing toward the child, either by word or act, indicates that the child is the child of the putative parent. That conduct may be construed by the tribunal to constitute evidence of parentage. When indefinite, ambiguous, or uncertain terms are used, the tribunal may use extrinsic evidence to show the putative parent's intent.").