NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| WARREN S., ) | |
| ) | Supreme Court No. S-17942 |
| Appellant, ) | |
| ) | Superior Court No. 3PA-19-00016 CN |
| v. ) | |
| ) | MEMORANDUM OPINION |
| STATE OF ALASKA, DEPARTMENT ) | AND JUDGMENT[*] |
| OF HEALTH & SOCIAL SERVICES, ) | |
| OFFICE OF CHILDREN'S SERVICES, ) | No. 1844 – August 25, 2021 |
| ) | |
| Appellee. ) | |
| ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Palmer, Kristen C. Stohler, Judge.

Appearances: Megan R. Webb, Assistant Public Defender, and Samantha Cherot, Public Defender, Anchorage, for Appellant. Anna Jay, Assistant Attorney General, Anchorage, and Treg Taylor, Attorney General, Juneau, for Appellee. Rachel Levitt, Assistant Public Advocate, and James Stinson, Public Advocate, Anchorage, for Guardian Ad Litem.

Before: Winfree, Maassen, Carney, and Borghesan, Justices. [Bolger, Chief Justice, not participating.]

## I.      INTRODUCTION

A father appeals the termination of his parental rights, arguing that the Office of Children's Services (OCS) did not make sufficient efforts to support his family

---

[*]      Entered under Alaska Appellate Rule 214.

with reunification and rehabilitative services. Specifically, the father argues that OCS failed to recognize that his lack of engagement with his case plan was due to cognitive issues which had to be addressed through a neuropsychological evaluation and treatment before he could be expected to deal successfully with his substance abuse issues. We conclude, however, that the superior court's findings of fact are not clearly erroneous and that they support the court's conclusion that OCS acted reasonably in its reunification efforts. We therefore affirm the order terminating the father's parental rights.

## II.     FACTS AND PROCEEDINGS

### A.      Background

Cody, born in January 2009, is the son of Annie S. and Warren S.[1] OCS took custody of him shortly after his birth because he tested positive for methadone. After about a year, OCS decided that Annie and Warren had been able to remedy any safety concerns and released Cody to their custody.

After closing the case in 2010, OCS received a number of reports alleging that Cody's parents were neglecting him and using drugs. OCS substantiated two reports of physical abuse, substance abuse, and neglect received in February 2019. The first of these reports alleged that Warren had tested positive for methadone, opiates, and methamphetamine during an appointment at Mat-Su Regional Medical Center; this prompted OCS to investigate whether Warren was able to meet Cody's needs. It was the second of these reports — an alleged domestic violence incident — that caused OCS to take custody of Cody again. According to the report, Cody was injured by a family friend and taken to the hospital by Alaska State Troopers; Warren, who was recovering from knee surgery at the time, was asleep (or, according to OCS, "impaired by an

---

[1] We use pseudonyms to protect the parties' privacy. Annie's parental rights were terminated at the same time as Warren's, but she has not appealed the termination order.

unknown substance") and unaware of what was going on. An OCS caseworker took emergency custody of Cody at the hospital after being unable to reach Warren. Cody was adjudged a child in need of aid under AS 47.10.011(6) (substantial risk of physical harm), (9) (neglect), and (10) (parental substance abuse).

OCS set up a case plan for Warren in April 2019. The plan required that Warren complete domestic violence and parenting classes, connect with a parent navigator, obtain a substance abuse assessment and follow its recommendations, submit to random drug testing, and sign releases of information that would give OCS access to his records so it could assess his progress.

### B. Termination Proceedings

OCS filed a petition to terminate Warren's parental rights in December 2019, contending that he "ha[d] not remedied the conduct or conditions that brought his child into [OCS's] custody and care." OCS represented that Warren had not completed any of his case plan activities and that "[a]ll attempts to engage [him] in his case plan [had] been unsuccessful."

The court held a termination trial over two days in September 2020. The OCS case worker who had taken Cody into custody at the hospital testified first. She testified that Warren had tested positive for methadone, opiates, and methamphetamine the week before the domestic abuse incident that prompted Cody's removal, and that he had refused to cooperate when asked to complete drug testing in the weeks that followed. She testified that Warren was hard to reach by phone and when she was able to reach him the reception was spotty. She testified that she had tried to place Cody with Warren's sister, but the sister admitted to a methamphetamine addiction and declined to take Cody.

A second OCS case worker testified next. She began by describing the primary goal of Warren's case plan: that he be able to provide Cody with a

"violence-free home and . . . develop violence-free relationships." The case worker described the plan's requirements that Warren attend parenting classes, obtain a parent navigator or peer support, complete urinalysis testing, and learn coping skills that would help him take care of himself. The case worker testified that after the first case meeting with Warren — which he left prematurely — she tried to reach him by phone and email "and would finally go out to his home to . . . see if [she] could catch him." She testified that she did finally "meet with him and provided him with his case plan."

The case worker testified that she referred Warren to a services provider to complete his parenting classes and set up a peer navigator, but when it was time to complete the connection neither she nor the provider could reach him. She testified that when she found Warren at home she urged him to engage with his case plan and complete a substance abuse assessment. She testified that on two separate occasions she made assessment appointments for Warren and arranged for a cab ride to the clinic, but although he filled out the initial intake paperwork he failed to attend either appointment. She testified that she called, emailed, and texted Warren to encourage him with his case plan but was usually unable to contact him; she also tried, unsuccessfully, to reach him through his sister. The case worker testified that Warren never attended a single parenting class or completed a single urinalysis or hair follicle test.

The case worker also expressed her "pretty severe concerns about [Warren's] substance abuse," testifying that he did not remember some of their conversations. Noting recent training she had received in how to recognize clients' drug use, she testified that Warren generally presented as if he was using drugs. Asked whether, given her concerns about Warren's memory, she had arranged a neuropsychological evaluation for him, she answered that — because of the "positive test results for drugs" in his records — she attributed his problems to drug use (although she acknowledged that some positive drug-test results could have been due to prescribed

medications). She denied that Warren had ever told her "he was suffering from mental health issues or was suicidal."

Warren also testified. When asked why he had not engaged with his case plan, Warren said that he suffered from "severe anxiety." He described a series of misfortunes that left him feeling "crippled" and "overwhelmed" — suffering a severe infection in his leg that almost required its amputation, spending nearly three months recovering in the hospital, struggling to keep his business going while he was hospitalized, and finally having to close his business. He testified that he felt "crushed . . . like a can" and "didn't even want to live [anymore]" because he was "so broken on the inside." He testified, however, that he did not share these dark thoughts with OCS. Asked about his drug use, he was somewhat unresponsive but admitted he "[had] a problem." When asked if he had memory problems, he answered that he often had panic attacks when someone was asking him questions and this could make his memory blurry.

### C.    The Superior Court's Findings

The superior court issued written findings of fact and conclusions of law terminating Warren's parental rights. The court determined that Cody was a child in need of aid under AS 47.10.011(10) due to Warren's "on-going abuse of controlled substances and his failure to remedy this concern." The court found that OCS presented "compelling evidence" showing that Warren's drug use put Cody "at substantial risk of harm." The court found support for this conclusion in the circumstances surrounding OCS's assumption of Cody's custody and Warren's own admission that "he continues to have untreated substance abuse and mental health concerns." It found that in addition to exposing Cody to dangerous situations and causing him to suffer physical abuse, Warren lacked the ability to provide for Cody's needs; the court noted that Cody had 40

absences from school while living primarily with his father and was significantly behind his grade level at the time of his removal.

The court also found that Warren "did not complete any of the activities on his case plan." It noted that Warren did not attend parenting classes, obtain a parent navigator, submit to any urinalysis tests, or obtain a substance abuse assessment, despite OCS case workers' urging and their help with referrals and transportation. The court pointed out that although OCS offered Warren the opportunity to determine whether domestic abuse classes were truly necessary, he did not take OCS up on the offer. The court also found that Warren failed to consistently participate in family contact with Cody, noting that the services provider that was coordinating his visits closed Warren's referral in December 2019 due to "excessive cancellations."

The court next found that OCS made "timely, reasonable efforts to provide family support services." The court found credible the OCS case worker's testimony that she attempted to reach Warren several times per month by phone, text, and email, by contacting family members, and by going to his home, but that Warren was unreachable or unresponsive for "significant periods of time." The court noted that OCS met with both Warren and Annie to develop case plans, made referrals for the parents to engage in case planning activities, arranged transportation, held team decision making meetings and administrative reviews, made repeated efforts to engage the parents, and provided Cody with therapeutic services. The court concluded by finding that it was in Cody's best interests to "terminate his parents' rights and free him for adoption."

Warren appeals the court's termination of his parental rights, contending that the evidence did not support its conclusion that OCS made reasonable efforts to reunite him with Cody.

## III. STANDARD OF REVIEW

"Whether OCS made reasonable efforts to reunify the family is a mixed question of law and fact."[2] Questions of law are reviewed de novo.[3] Questions of fact are reviewed for clear error.[4] "Findings of fact are clearly erroneous if a review of the entire record in the light most favorable to the party prevailing below leaves us 'with a definite and firm conviction that a mistake has been made.' "[5]

## IV. DISCUSSION

**The Superior Court Did Not Err In Concluding That OCS Made Reasonable Efforts Toward Reunification.**

One of the essential findings a court must make before terminating parental rights is that OCS "has complied with the provisions of AS 47.10.086 concerning reasonable efforts."[6] The cited statute requires OCS to make "timely, reasonable efforts to provide family support services to the child and to the parents or guardian of the child";[7] these efforts must include "identify[ing] family support services that will assist the parent . . . in remedying the conduct or conditions in the home that made the child in

---

[2] *Sherman B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 290 P.3d 421, 428 (Alaska 2012).

[3] *Id.*

[4] *Id.*

[5] *Brynna B. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 88 P.3d 527, 529 (Alaska 2004) (quoting *A.B. v. State, Dep't of Health & Soc. Servs.*, 7 P.3d 946, 950 (Alaska 2000)).

[6] AS 47.10.088(a)(3).

[7] AS 47.10.086(a).

need of aid" as well as "actively offer[ing] the parent" these services.[8] Warren challenges the superior court's conclusion that OCS satisfied this statutory requirement.

As outlined above, the superior court made a number of factual findings supporting its reasonable efforts decision. Warren does not challenge these factual findings; he concedes that OCS took positive steps to support and encourage him and that he did not comply with his case plan. He argues, however, that OCS's efforts were insufficient because the case worker failed to consider whether his lack of engagement was due to his claimed mental health issues. He notes the case worker's stated concerns about his memory, her concession that a neuropsychological evaluation would reveal any cognitive deficiencies, and her failure to arrange a mental health exam because she attributed his memory loss to drugs. Warren argues that the case worker's lack of credentials in "toxicology or medicine" meant that this was just "speculation on [her] part." He argues that although OCS has some discretion in determining what efforts to pursue and when to pursue them, "when a case worker fails to consider an issue that might preclude a parent from moving forward on any other services, such discretion has clearly been abused and reasonable efforts have not been made." He also contends that it was not reasonable for OCS to require him to complete a substance abuse assessment and testing as a first step; he argues that if he had first received proper care for his mental health, he might have been able to attend the substance abuse appointments that OCS set up for him, and, consequently, he might have been able to remedy the conduct that placed Cody at risk of harm.

The superior court was required to consider OCS's reunification efforts in

---

[8]     AS 47.10.086(a)(1)-(2).

their entirety.[9] OCS "has some discretion both in determining what efforts to pursue and when to pursue them."[10] Its efforts "must be reasonable but need not be perfect."[11]

OCS's immediate focus on Warren's substance abuse issues is understandable. Parental substance abuse was one of the reasons Cody was adjudged to be a child in need of aid when taken from Warren's home in early 2019. The court noted at that time that its primary concern was Warren's "historical use of pain medication," as his behavior during the domestic violence incident could have been explained by the medications he was legally prescribed after his surgery. OCS followed up by referring Warren repeatedly for substance abuse assessments and testing, as well as arranging the necessary transportation.

More importantly, we cannot say that it was error for the superior court to find reasonable efforts despite the case worker's failure to refer Warren for some kind of mental health evaluation — either as a first step or simultaneously with the focus on substance abuse treatment. The superior court heard evidence that Warren had a substance abuse problem; that his cognitive issues appeared to be consistent with what was known about his drug use; and that he never told OCS that his cognitive issues were mental-health-related instead. And the court heard no evidence — other than Warren's own testimony — that the case worker's assessment was wrong, i.e., that Warren's inability to engage *was* the result of something other than drug use.

---

[9] *Frank E. v. State, Dep't of Health & Soc. Servs.*, *Div. of Family & Youth Servs.*, 77 P.3d 715, 720 (Alaska 2003).

[10] *Sherman B. v. State, Dep't of Health & Soc. Servs.*, *Office of Children's Servs.*, 290 P.3d 421, 432 (Alaska 2012).

[11] *Audrey H. v. State, Office of Children's Servs.*, 188 P.3d 668, 678 (Alaska 2008).

To the extent the superior court's reasonable efforts determination rests on its assessment of the relative credibility of the case worker's and Warren's testimony, we will not second-guess it.[12] "It is the trial court's function and not that of a reviewing court to determine the credibility of witnesses and the weight to be given evidence,"[13] and we "will not re-weigh evidence when the record provides clear support for the trial court's ruling."[14] Because the superior court did not clearly err in its findings of fact, and because those findings support the conclusion that OCS met its statutory reasonable efforts obligation, we conclude that the termination order must be affirmed.

## V. CONCLUSION

The superior court's order terminating Warren's parental rights is AFFIRMED.

---

[12] *See Olsen & Sons Logging, Ltd. v. Owens*, 607 P.2d 949, 952 (Alaska 1980) ("[D]ue regard must be given to the opportunity of the trial court to judge the credibility of the witnesses.").

[13] *Id.* at 953.

[14] *Tessa M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 182 P.3d 1110, 1114 (Alaska 2008).